667 A.2d 116

**ACandS, INC. et al.**

v.

**Thomas GODWIN et al.**

**No. 23, Sept. Term, 1994.**

Court of Appeals of Maryland.

Oct. 18, 1995.

On Motion for Reconsideration
Dec. 1, 1995.

336

Roger W. Titus (Patrick L. Clancy, Paula T. Laboy, Venable, Baetjer and Howard, LLP, Rockville, Gerry Hoban Tosta-

noski, Scott Patrick Burns, Tydings & Rosenberg, Baltimore, William D. Harvard, Blasingame, Burch, Garrard & Bryant, P.A., Athens, GA; R. Cornelius Danaher, Frank H. Santoro, Danaher, Tedford, Lagnese & Neal, P.C.; [Attorneys for Pittsburg Corning Corporation]; Louis G. Close, Jr., Warren N. Weaver, Fenton L. Martin, Gardner M. Duvall, Whiteford, Taylor & Preston, LLP, Baltimore [Attorneys for Porter Hayden Company] ), all on brief.

B. Ford Davis (Whiteford, Taylor & Preston L.L.P., Baltimore, all on brief), William D. Harvard, Warren N. Weaver, James D. Miller, for appellants/cross-appellees.

Patricia J. Kasputys (Peter G. Angelos, Kenneth D. Pack, Law Offices of Peter G. Angelos, Towson, Ronald L. Motley, Joseph F. Rice, Susan Nial, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC; John J. McConnell, Jr., Robert J. McConnell, Ness, Motley, Loadholt, Richardson & Poole, Providence, RI, all on brief), John J. McConnell, Jr., David L. Palmer, Thomas P. Kelly, Kenneth D. Pack, for appellees/cross-appellants.

F. Ford Loker, Church & Houff, P.A., amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

In this opinion we address the appeals and cross appeals in the consolidated actions known to the Maryland asbestos litigation industry as *Abate I*. With one exception we shall affirm the judgments for compensatory damages and, for insufficient evidence, reverse the judgments for punitive damages.

*Abate I* is the first trial after the consolidation in the Circuit Court for Baltimore City of 8,555 actions involving claims for personal injuries or wrongful death allegedly resulting from exposure to asbestos. In that trial, held from February 18 to August 10, 1992 before Judge Marshall A. Levin, certain

common issues relating to liability were decided, as well as all issues between six illustrative plaintiffs and certain nonsettling, trial defendants. The issues that we address in this opinion are tabulated, *infra.*

In September 1987, when there were approximately 1,000 asbestos case filings in the Circuit Court for Baltimore City, Judge Levin was administratively designated as the "judge in charge" of asbestos litigation in that court. By April 1990 the number of such cases in Baltimore City had increased to more than 4,900. It was anticipated that asbestos cases would continue to be filed at the rate of up to fifty cases per week. Judge Levin had been applying alternative dispute resolution techniques, but with only limited success.

The case management plan in April 1990 called for trying on all issues batches of ten plaintiffs' actions per consolidated trial. This represented an increase from five plaintiffs' actions per consolidated trial caused by a reduction to two judges from the four judges previously available to try asbestos cases. If these cases were heard eleven months of the year, and if a new consolidation were set for trial in each of those eleven months before each of the two available judges, a maximum of 220 Baltimore City asbestos cases could be disposed of by trial or, with the incentive of a fixed trial date, by settlement. But the queue of undisposed of cases would lengthen into the Twenty-first Century, because annual new filings were approximately ten times greater than the number of cases that could be tried in the same period.

Against that background Judge Levin determined to consolidate the common issues of all of the Baltimore City asbestos cases into one trial.

The initial mass consolidation order of April 1990 applied to all asbestos personal injury and wrongful death cases in the Circuit Court for Baltimore City filed as of April 1, 1990 in

which process was served by June 1, 1990.[1] The principal common issues to be decided in the consolidated phases of the trial were "state of the art" and punitive damages.

Also pending as of April 1990 were more than 3,000 asbestos cases, in total, in the circuit courts for Baltimore, Prince George's, Allegany, and Washington Counties. These cases were transferred to the Circuit Court for Baltimore City pursuant to Maryland Rule 2–327(d) for pretrial and for trial of common issues as part of the same consolidation.[2]

Judge Levin, in molding the consolidation, determined that the claims of six plaintiffs should proceed to complete disposition on all issues. Three plaintiffs were selected by agreement of counsel for the consolidated plaintiffs, and three plaintiffs were selected by agreement of counsel for the consolidation trial defendants. The purpose of trying these six illustrative claims in full was to give the jury a better understanding of the issues involved in an asbestos case.

Over one hundred different defendants had been sued, cumulatively, in the 8,555 actions that were consolidated. Prior to trial, however, the plaintiffs voluntarily dismissed their claims against all but fifteen of the defendants originally named. The trial court then severed from the consolidated trial the cross-claims brought by the fifteen remaining defendants against the defendants whom the plaintiffs had dismissed. Those cross-claims would be tried at a later time in a consolidated cross-claim trial (*Abate II*). Cross-claims between the fifteen remaining defendants would be tried in *Abate I* as mini-trial issues applicable only to a particular illustrative plaintiff. If, however, any of the fifteen consolidated trial defendants should settle with the consolidated plain-

---

1. This feature of the order was later modified to include in the consolidated trial cases filed as of October 1, 1990 in which process was effected by November 30, 1990.

2. It is no coincidence that Md.Rule 2–327 was amended on June 28, 1990, effective July 1, 1990, by adding subsection (d). It permits transfer initiated by the transferor court for a consolidation based on commonality of issues in cases pending in multiple jurisdictions.

tiffs, the cross-claim liability of that defendant then would be resolved, ordinarily, in *Abate II*. The exception to the latter procedure was that an *Abate I* defendant that settled with the consolidated plaintiffs could elect, at its sole option, to have certain issues relating to its cross-claim liability tried in *Abate I* as a common issue binding all cross-claimants in the consolidation.

Prior to jury selection one of the fifteen defendants settled. During jury selection two more defendants settled. During the trial six other defendants settled. Thus the jury ultimately considered the issues between the illustrative plaintiffs and only six defendants. In addition two of the settling defendants elected to have their cross-claim liability decided as a common issue in *Abate I*.

Judge Levin divided the issues to be decided into four phases, and the court took jury verdicts on special interrogatories for each phase. Phase I decided, as to specific products of each remaining defendant and of the two cross-claim defendants, whether that defendant was negligent and/or strictly liable and, if so, the year in which that liability arose and the year in which it may have ended. Phase I was submitted to the jury on July 10, 1992, and the verdict was rendered on July 13. Each of the six defendants and one of the cross-claim defendants were found negligent and strictly liable as to all products submitted. These issues were common to the consolidation, and the findings applied to the cases of the other 8,549 plaintiffs.

Phase II resolved individual issues as to the six illustrative plaintiffs. These issues included: (1) whether the plaintiff was a foreseeable user and/or bystander; (2) whether the plaintiff had contracted an asbestos-related disease and, in the wrongful death cases, whether that disease had caused the death; (3) the years, if any, during which the plaintiff was exposed to the products of specific defendants named in the special

verdict form;[3] and (4) for those defendants for which years of exposure were found under issue three, whether that exposure was a substantially contributing factor in causing the asbestos related disease and/or death. The remaining issues in phase II dealt with cross-claims and the amount of compensatory damages.[4]

The phase II issues were submitted to the jury on July 21, and the jury returned its verdict on July 23. The three plaintiffs selected by plaintiffs' counsel obtained verdicts. Each of the three illustrative plaintiffs selected by defendants' counsel was found not to have developed an asbestos-related disease, so that judgments in favor of the six trial defendants were entered as to those plaintiffs. The successful plaintiffs were Leggette McNiel (McNiel) and the survivors of Ira Russell (Russell) and of Lawrence Leaf (Leaf). McNiel was diagnosed with asbestosis in 1985, and he requires supplemental oxygen from a portable tank. Russell died of asbestosis in January 1992. Leaf's exposure to asbestos resulted in mesothelioma, from which he died in September 1986. Of the defendants against whom a verdict for compensatory damages was returned, those who are appellants in the instant matter are ACandS, Inc. (ACandS), Pittsburgh Corning Corporation (PCC) and Porter Hayden Company (PH).

Phases III and IV addressed punitive damages. The punitive damages issues were common issues under the consolidation order. The court granted a motion for judgment as to punitive damages in favor of ACandS and in favor of one other defendant. That latter defendant settled after the appeal was noted in this case. In the Phase III verdict, rendered on July 30, the jury found each of the four remaining defendants liable for punitive damages. One of these four defendants subse-

---

**3.** The form listed only those defendants as to whose products there was, in the trial court's view, sufficient evidence of exposure to generate a jury issue.

**4.** In all of the cases in which there were verdicts in favor of a plaintiff the jury found that there was no exposure of the plaintiff to the products of a cross-claim defendant.

quently settled. Another, who filed a voluntary petition for relief under the Bankruptcy Code after the trial, was dismissed from the case.

The two defendants found liable for punitive damages who are appellants are PCC and PH. The jury found each liable for punitive damages to users of, and bystanders to users of, their products from 1965 to the date of the verdict, July 30, 1992.

Phase IV undertook to quantify punitive damages. The jury finding would be binding in other cases in which verdicts for compensatory damages for exposures after 1965 might be entered against PCC or PH. In order to be able to apply the determination of the jury in the consolidated trial to the claims of any other successful consolidation plaintiffs, the trial court instructed the jury to determine the "amount of punitive damages for each $1 of each defendant's share of compensatory (actual) damages." On August 10, 1992 the jury returned a multiplier of 1.5 as to PCC and of .35 as to PH.[5]

The defendants filed post trial motions which, after briefing and argument, were denied for the reasons stated in a 225 page opinion by Judge Levin of June 1993. When Judge Levin undertook to direct the entry of final judgment in favor of the plaintiffs, one of the then defendants sought a writ of mandamus or prohibition in this Court. *Keene Corp. v. Levin,* 330 Md. 287, 623 A.2d 662 (1993). Following the filing of the opinion in *Keene,* where we denied issuance of the writ, the parties to this appeal entered into an agreement by which, *inter alia,* the defendants-appellants, PCC, PH, and ACandS, renounced their rights to any further reduction of their liability to Leaf, Russell, and McNiel that otherwise might result from adjudication of cross-claims asserted by them that would

---

5. The reference to a defendant's "share of compensatory (actual) damages" refers to the net amount payable by a joint tortfeasor. Determination of the amount requires knowledge of the terms of the releases obtained by settling defendants as well as knowledge of the operation of the Maryland Uniform Contribution Among Tort–Feasors Act, Md.Code (1957, 1994 Repl.Vol.), Art. 50, §§ 19 through 24. Neither the factual nor legal information was before the jury.

be tried in *Abate II*. Thereupon, by order of November 12, 1993 Judge Levin directed the entry of final judgment in specific dollar amounts that reflect the credits resulting from the releases of trial defendants who had settled up to that date. Appeals were noted by defendants and plaintiffs. We then issued the writ of certiorari prior to consideration of the matter by the Court of Special Appeals.

When one of the judgment debtor defendants settled during the pendency of this appeal, PCC, PH, and the McNiel and Russell plaintiffs stipulated in May 1994 to a reduction in compensatory damages. As modified by the May 1994 stipulation the judgments that were directed to be entered by the order of November 1993 are as follows:

As to McNiel, judgment jointly and severally against PCC and PH for $1,193,082.30 in compensatory damages, $624,-882.30 against PCC in punitive damages, and $145,805.87 against PH in punitive damages.

As to Russell, judgment jointly and severally against PCC and PH for $1,490,872.40 in compensatory damages, $1,118,-154.30 against PCC in punitive damages, and $260,902.67 against PH in punitive damages.

As to Leaf, judgment jointly and severally against ACandS, PCC, and PH for $2,520,000 in compensatory damages on survival, consortium, and wrongful death claims, $1,110,000 against PCC in punitive damages, and $259,000 against PH in punitive damages.

Although many issues have been raised by the parties in their briefs, it is necessary that we decide only the following:

I. Sufficiency of the Evidence of Liability for Compensatory Damages.
 A. Liability of PCC to McNiel;
 B. Liability of PCC to Russell;
 C. Liability of PCC to Leaf;
 D. Liability of PH to McNiel.
II. Liability for Punitive Damages of:
 A. PCC,

B. PH, and

C. ACandS.

III. Legality of the Consolidation.

IV. Reformation of the Verdict against ACandS.

V. Mistrial Motions and Objections Concerning:

 A. Interim Arguments—Use and Alleged Abuses;

 B. References to Settlements;

 C. Attacks on Defendants and Defense Witnesses;

 D. · Attacks on Credibility of Opposing Counsel;

 E. References to Matters Not in Evidence.

VI. Admission in Evidence of Unadjudicated Suits against PCC by Former Employees.

VII. Constitutionality of the Pressure to Settle.

VIII. The Appeal by Owens–Illinois, Inc.

IX. Allocation of Costs.

## I

PCC and PH challenge the legal sufficiency of the evidence to support a jury finding that their respective asbestos products were a substantial cause of injury. PCC challenges the sufficiency as to all three plaintiffs while PH challenges only as to McNiel.

PCC was a manufacturer of asbestos block and pipe covering, which it sold under the trade name Unibestos. It was stipulated that PCC manufactured Unibestos only in the period between July 1962 and February 1972, and that sales continued thereafter, although the length of the period was disputed. PH was both a supplier and installer of asbestos products, principally those manufactured by Johns–Manville (JM). Plaintiffs undertook to demonstrate their exposures to products identified to these defendants only by proof directed to exposure at the steelmaking facilities of Bethlehem Steel Corporation (Bethlehem) at Sparrows Point (the Point).

Steelmaking requires great heat, and Bethlehem, in order to conserve heat, liberally used asbestos products in new con-

struction, rebuilding, and repair throughout the Point. Prior to the rise of foreign competition, the Point, in terms of production and number of employees, was one of the largest steelmaking facilities in the world. The instant appeals are concerned principally with open hearth furnaces, soaking pits, and blast furnaces. These facilities are located in an area comprising approximately two square miles out of the total area of the Point.

McNiel, Russell, and Leaf were bystanders, in the sense that they did not work directly with asbestos products. In *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992), we adopted the following test to determine the legal sufficiency of the evidence of substantial-factor causation in asbestos cases.

> "Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. 'In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.' "

*Id.* at 210–11, 604 A.2d at 460 (citations and attributions omitted).

This so-called "frequency, regularity, and proximity" test is the majority rule. *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1301 (8th Cir.1993); *see also Tragarz v. Keene Corp.,* 980 F.2d 411, 420–21 (7th Cir.1992); *Slaughter v. Southern Talc Co.,* 949 F.2d 167, 171 (5th Cir.1991); *Lohrmann v. Pittsburgh*

*Corning Corp.,* 782 F.2d 1156, 1162–63 (4th Cir.1986); *Zenson v. Owens Corning Fiberglas Corp.,* 836 F.Supp. 302, 304 (E.D.Pa.1993). In Parts I.A, I.B, and I.C we apply this test to each plaintiff in relation to PCC and in Part I.D we consider PH's argument.

The plaintiffs' product identification evidence directed at PCC rests on the testimony of two witnesses, one of whom was Thomas Webb (Webb). Webb worked in the employ of Bethlehem at the Point as a pipe coverer from 1956 to 1968. Webb identified Unibestos as one of the brands of pipe covering, sometimes called "half-rounds," with which the Bethlehem pipe coverers worked. Webb was one of a crew of twenty persons employed by Bethlehem in its pipe covering department at the Point. He worked wherever there were steam lines. These areas included the open hearth furnaces, the soaking pits, and the blast furnaces.

Webb and his fellow, Bethlehem-employee, pipe coverers worked on new construction, maintenance, and furnace tear-downs. A furnace tear-down, or outage, involves the complete removal of all of the existing insulation from a furnace and from its interior and exterior piping, replacement of the piping, and replacement of all the insulation. While Bethlehem-employee pipe coverers were working with insulation, members of other crafts would be working in the vicinity. These could include Bethlehem production employees and the employees of outside contractors. Webb testified, in essence, that wherever he worked throughout the Point, Unibestos pipe covering was used interchangeably with that of JM, Armstrong, Calcilite, Caltemp, and Kaylo.

The other product identification witness was John Lagaz (Lagaz) who was employed by Bethlehem at the Point in 1953 and, after two years of military service, from 1956 to 1965 as a pipe coverer. Thereafter he worked for Bethlehem as a steam leak welder until his retirement in 1991. Between 1966 and the mid–1970s seventy percent of his time was spent with the blast furnaces. Lagaz identified Unibestos block and pipe covering as asbestos products with which he worked on each

of the ten blast furnaces at the Point. He testified that Unibestos, Kaylo, JM, and Armstrong were used interchangeably in blast furnace outages until the mid–1970s when Bethlehem started using "quite a bit more" fiberglass.

## A. *McNiel*

 McNiel was a career Bethlehem employee who was hired in 1956 and retired in 1983. From 1960 to his retirement McNiel was an ingot checker at the No. 4 Open Hearth Shop. The jury could find that McNiel's exposure to asbestos, including Unibestos, resulted from tear-downs of the open hearth furnaces in the No. 4 Open Hearth Shop and from tear-downs at the No. 5 Soaking Pit, another type of furnace to the north of No. 4 Open Hearth.

Number 4 Open Hearth is a huge metal shed, approximately eight stories in height with the sides open at the ground story, that is more than 500 yards in length. It contains seven open hearth furnaces. Immediately adjacent to, but not abutting, No. 4 Open Hearth on the east is another large metal shed building approximately one-half as tall as No. 4 Open Hearth and about one-half as long. This is the No. 4 Open Hearth Stripper Building. Its north and south ends are open and it is open for approximately two-thirds of its height. The southern end of this stripper building is approximately on line with the southern end of No. 4 Open Hearth. North of this stripper building, and parallel with the east side of the balance of No. 4 Open Hearth, is an open area, the No. 4 Mold Yard. As an ingot checker, McNiel worked principally in the mold yard. Where McNiel principally worked placed him within seventy-five to one hundred yards of one of the furnaces in No. 4 Open Hearth.

The product of one production cycle of an open hearth furnace is called a "heat." That product, molten steel and slag, is tapped into a ladle capable of holding 380,000 pounds. The molten steel is poured from the ladle into very large molds that are standing in open, shallow-bed, railroad cars. These beds are filled with a sand-like material, not identified in the record, that is capable of forming a base for the pour of

molten metal into the mold. One heat might fill thirty to fifty molds. A train of molds, comprising a heat, was then moved to the stripper building, where the molds would be removed by a pinchers and ram, operated from a crane. McNiel's principal duty was to time the removal of the molds appropriately so that the molded steel, called an ingot, would neither ooze from ingot shape nor cling to the mold. Ingots, stripped of the molds, would then be moved on the same railroad cars to a soaking pit, for further processing, hereinafter described.

Ingot checking ordinarily required McNiel to enter No. 4 Open Hearth five or six times a shift. This estimate assumed that two furnaces were in tear-down or repair and that five of the seven open hearth furnaces were in production. McNiel went into the furnace building in order to get information sheets which told him when a particular heat had been tapped. He obtained these information sheets at the pit office in No. 4 Open Hearth, by walking past four of the furnaces.

Out of the seven blast furnaces in the building, there was always at least one furnace that was not operating because of a tear-down. Several different departments of Bethlehem employees at the Point would be involved in the tear-down and repairing of the furnaces, including the workers who "had to reline pipes and cover pipes." Pipes were all over the place in the No. 4 Open Hearth. These workers used semi-rounds. McNiel walked close to these pipe coverers and breathed the dust.

Approximately 600 feet from the northern end of No. 4 Open Hearth was one side of No. 5 Soaking Pit which extended northeasterly for approximately 800 feet. A soaking pit is a series of side by side furnaces, set below ground level. Its purpose is to reheat the ingots to 2,500 degrees so that they can be processed in a nearby mill. Each furnace chamber of No. 5 Soaking Pit was approximately 20 feet by 12 feet by 12 feet, with a steel lined wall that was insulated with asbestos block which in turn was covered by brick. The chambers in a soaking pit were continually rebuilt and relined, since the life of a chamber was approximately twelve to fifteen months.

Bethlehem-employee pipe coverers worked in the soaking pits, as well as Bethlehem-employee brick layers who were removing and applying asbestos block. From time to time, when problems arose, McNiel was also required to go to No. 5 Soaking Pit. This would occur, for example, if an ingot had fallen off of a railroad car in the stripping process.

The foregoing evidence sufficiently supports a finding that exposure to Unibestos was a substantial cause of McNiel's asbestosis. Bethlehem employees continually removed and reapplied insulation to the furnaces in No. 4 Open Hearth. For more than twenty years McNiel worked outside the partially open-sided No. 4 Open Hearth building and was required to enter it five to six times a day. He was also required from time to time for more than two decades to go to No. 5 Soaking Pit. Based on the evidence that Bethlehem employees regularly used Unibestos half-rounds and block, McNiel has satisfied the *Balbos* test as to PCC.

### B. *Russell*

Russell's testimony was presented via his deposition taken in July 1989. Russell was not a Bethlehem employee. He had begun his work career in the 1940s as a welder, and he became a pipefitter in the 1950s. From the 1950s until his retirement in the early 1980s he worked for a number of different contractors who at various times performed work at the Point.

Clearly Russell was exposed to asbestos. When new pipe was installed it was industry practice for pipe coverers to follow behind the pipefitters. The pipe coverers would cut and fit the half-rounds and mix "mud," *i.e.*, cement containing asbestos. There was also evidence that, in performing some repair and rebuild jobs, pipefitters would remove the asbestos covering from the old pipes that were to be replaced. The question here is whether, and to what extent, Russell was exposed to Unibestos.

Russell was unable to identify any asbestos product with which he came in contact at the Point, other than to recall

work trailers bearing the name Reid Hayden. He worked for Lloyd E. Mitchell, Inc., for Heat and Power for seven or eight years, for Riggs–Distler, and for Poole and Kent. For Poole and Kent, Russell worked at almost every mill at the Point—"all over the place." With Heat and Power he was "in and out" of the Point and "all over different places." With Riggs–Distler, Russell worked the plate mill, the soaking pits, the open hearth, and the rolling mill. He worked at No. 4 Open Hearth where he did both new construction and repair work with other trades, including pipe coverers.

In preparation for his deposition Russell apparently had made notes recording his best recollection of the dates when he worked at the Point for Riggs–Distler. He testified that these dates were "close." Within the decade during which PCC produced asbestos products, Russell's notes reflect that he was at the Point for Riggs–Distler a total of twelve months on three occasions, in December 1963, from September 1969 through March 1970, and from November 1970 through February 1971. He was also at the Point in March and April 1972, the months next following PCC's cessation of manufacturing Unibestos. The jury could infer that Unibestos previously purchased by Bethlehem was still in its inventory during those two months.

Russell was also asked whether he could recall seeing any trades other than pipe coverers actually working with products that he believed contained asbestos, an inquiry that developed the following testimony:

" 'Answer: No. No other trades. They also had company pipe coverers there, too. They were working with that stuff.

" 'Question: From Bethlehem Steel?

" 'Answer: Yes.

" 'Question: How do you know they were from Bethlehem Steel?

" 'Answer: They *always* kept a bunch around. We knew the difference from who was who.

" 'Question: Could you tell from the hats?

" 'Answer: You could tell because they have a badge.' "
(Emphasis added).

Thus, the evidence places Russell at the Point doing pipe covering work for twelve to fourteen months while Unibestos was available to Bethlehem pipe coverers. Further, pipe coverers employed by Bethlehem were "always" around when Russell was working for a contractor. The jury could conclude from Webb's testimony that Bethlehem pipe coverers regularly used Unibestos interchangeably with the products of other manufacturers. Pipe coverers work in proximity to pipefitters. There was sufficient evidence of substantial causation to take the case to the jury on behalf of Russell against PCC.

### C. *Leaf*

The evidence of Leaf's exposure to asbestos is the testimony of his brother, Matthew. The Leaf brothers worked together as pipefitters employed by contractors. PCC submits, and we agree, that the sufficiency of the substantial cause evidence as to PCC turns on Leaf's work in 1965 on No. 5 Blast Furnace at the Point.

In 1965 there was a row of ten, identical, blast furnaces at the Point extending along the south side of East Furnace Road for approximately one mile. Number 5 Blast Furnace was just west of No. 6 Blast Furnace which was directly across Furnace Road from, and approximately 500 feet south of the southern end of No. 4 Open Hearth. These blast furnaces were complexes consisting of the furnace proper and its stoves. The furnace itself is a structure approximately 200 feet high by 125 feet in circumference. Each blast furnace is heated by four stoves, connected to the furnace by piping. Each stove is 175 feet high. Lagaz described each complex as involving "miles" of covered pipe.

The piping, its asbestos covering, and the block insulation in the furnace and stoves were periodically replaced. Lagaz estimates there was an outage of one or two blast furnaces per year. The process of stripping, repiping, and reinsulating a

blast furnace took approximately three months per complex to complete. Thus, during three to six months of every year, a blast furnace was being refitted at the Point from 1953 through 1970 according to Lagaz's testimony. Up to 1,000 persons would be engaged over a twenty-four hour period in working on a blast furnace outage.

Lagaz compares the asbestos dust to shaking a bag of flour, and the dust was present all day. He testified, in effect, that JM, Unibestos, Kaylo, and Armstrong half-rounds and block were used at all ten blast furnaces between 1953 and the mid–1970s. The jury could reconcile this recollection-based testimony with the stipulated period of Unibestos manufacture by concluding that Unibestos was used interchangeably from 1962 to 1972.

The Leaf brothers worked on the removal of the old asbestos covering from the pipes at No. 5 Blast Furnace and on the installation of new pipe. Installation of new pipe was followed by pipe covering which Lagaz performed. Referring to outages, as opposed to maintenance work, Lagaz testified that he used Unibestos pipe covering and block interchangeably with three other asbestos manufacturers' products in each of the ten blast furnaces. The jury properly could infer that Unibestos was used as pipe covering and block in the massive reinsulation of No. 5 Blast Furnace in 1965.

The Leaf brothers worked on the No. 5 Blast Furnace outage for a shift of twelve hours in a twenty-four hour period, seven days each week, for six consecutive weeks. Thus, there was sufficient evidence that the plaintiff Leaf was regularly and proximately exposed to Unibestos, which was frequently used.

### D. *PH and McNiel*

PH describes itself as, at all relevant times, an insulation contractor and supplier of thermal insulation products in Maryland and three other states. PH asserts, and McNiel does not dispute, that there is no evidence placing McNiel in proximity to PH insulators. McNiel instead relies on the

evidence of Webb and Lagaz identifying JM asbestos products in use throughout the Point. To connect PH to JM, McNiel asserts that PH was the exclusive distributor for JM in Maryland from 1950 to 1969. To prove that contention McNiel cites excerpts from a deposition of Charles Holterman (Holterman) taken on July 29, 1981 in connection with litigation then pending in New Jersey.

As PH points out, the Holterman deposition testimony is not substantially different from the Holterman testimony that we considered in *Balbos*, 326 Md. at 214–15, 604 A.2d at 462. The 1981 Holterman deposition reflects that, from the standpoint of PH as a seller of asbestos products, it thought of itself as an exclusive distributor for JM. From the standpoint of JM as a seller, however, the Holterman testimony reflects that some of the product lines that PH was selling as a JM distributor were also available and sold through JM distributors of refractory products. Further, JM also sold directly to certain accounts, whom JM called "original equipment manufacturers." The quoted expression was not explained in the evidence.

In *Balbos* we held that a substantially similar description of the relationship between PH and JM did not permit the jury reasonably to infer that JM products at the worksite were PH products. *Balbos*, 326 Md. at 214, 604 A.2d at 462. That holding applies to McNiel's claim against PH as well.

At oral argument McNiel cited to two portions of the voluminous original record to demonstrate that the proof here for liability exceeded that in *Balbos*. In the case before us PH stipulated with the plaintiffs that products sold by PH to Bethlehem were used at the Point by Bethlehem employees and by other contractors. Also, an official of another insulation contractor, MCIC, Inc., stated that he did not know of any JM distributor, other than PH, in this area, that distributed on a regular basis. This additional testimony is consistent with Holterman's testimony and does not alter the result from that in *Balbos*.

Accordingly, the judgment in favor of McNiel against PH is reversed.

## II

### Punitive Damages

In this part we consider the contentions of PCC and PH that the trial court erred in denying their motions for judgment on the issue of punitive damages, and we consider the plaintiffs' contention that the motion for judgment was erroneously granted in favor of ACandS on punitive damages.

In Phase III the jury found that punitive damages should be assessed against both PCC and PH as to users and bystanders from 1965 to the date of verdict. "User" had been defined for the jury "as an individual who comes in contact with asbestos fibers by directly handling an asbestos-containing product." "Bystander" had been defined for the jury "as an individual who did not directly handle an asbestos-containing product, but was near enough to an asbestos-containing product's fibers to come in contact with those fibers."

### The Maryland Rule

The test for the imposition of punitive damages in a non-intentional tort action was articulated in *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633, *reh'g denied,* 325 Md. 665, 602 A.2d 1182 (1992). In *Zenobia,* this Court made it clear that a plaintiff must prove actual malice, not merely implied malice, to recover punitive damages in a non-intentional tort action. *Zenobia,* 325 Md. at 460, 601 A.2d at 652. *Zenobia* announced that a plaintiff could prove actual malice by establishing that the "defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud." *Id.* (footnotes omitted). *See Montgomery Ward v. Wilson,* 339 Md. 701, 664 A.2d 916 (1995); *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 652 A.2d 1117 (1995); *Komornik v. Sparks,* 331 Md. 720, 725, 629 A.2d 721, 723 (1993); *Adams v.*

*Coates,* 331 Md. 1, 13, 626 A.2d 36, 42 (1993); *Davis v. Gordon,* 183 Md. 129, 133, 36 A.2d 699, 701 (1944).

We recognized that the term "actual malice"

> "has meant different things in the law, that its popular connotation may not always be the same as its legal meaning, and that its use has been criticized. Nevertheless, we simply use the term in this opinion as a shorthand method of referring to conduct characterized by evil motive, intent to injure, ill will, or fraud."

*Zenobia,* 325 Md. at 460 n. 20, 601 A.2d at 652 n. 20 (citations omitted). This Court referred to an earlier case in which the "actual malice" standard was described as follows:

> "[T]o entitle one to [punitive] damages there must be an element of fraud, or malice, or evil intent . . . entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others."

*Id.* at 455, 601 A.2d at 650 (quoting *Philadelphia, W. & B.R. Co. v. Hoeflich,* 62 Md. 300, 307 (1884)).

*Zenobia* recognized the inherent difficulty in translating the aforementioned definition of "actual malice" to products liability cases. *Id.* at 460–63, 601 A.2d at 653–54. We noted that "it is not likely that a manufacturer or supplier of a defective product would specifically intend to harm a particular consumer." *Id.* at 461, 601 A.2d at 653. Consequently, "in products liability cases the equivalent of the 'evil motive,' 'intent to defraud,' or 'intent to injure,' which generally characterizes 'actual malice,' is [1] actual knowledge of the defect and [2] deliberate disregard of the consequences." *Id.* at 462, 601 A.2d at 653. This two-part standard looks to the state of mind of the defendant.

Additionally, we required in *Zenobia* that "in *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *Id.* at 469, 601 A.2d at 657. We reasoned:

"Use of a clear and convincing standard of proof will help to insure that punitive damages are properly awarded. We hold that this heightened standard is appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm."

*Id.*

This Court was careful to note that the relevant inquiry is as to the defendant's knowledge of the defect and danger associated with the product, "at the time the product left the defendant's possession or control." *Id.* at 462, 601 A.2d at 653–54. In *United States Gypsum Co. v. Mayor of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994), we further elaborated:

"[O]ur punitive damages test has a temporal element. While we acknowledge that there may be cases where particular post-sale evidence may tend to show actual knowledge and conscious disregard at the time of sale, evidence which merely demonstrates an awareness acquired after sale does not indicate actual malice at the time of sale."

336 Md. at 190 n. 22, 647 A.2d at 427 n. 22 (citations omitted).

■ In defining the knowledge component, the *Zenobia* opinion clearly stated that "constructive knowledge," "substantial knowledge," or "should have known," would not constitute the actual knowledge required to support an award of punitive damages. 325 Md. at 462, 601 A.2d at 653. Nevertheless, a willful refusal to know does constitute actual knowledge. *Id.* at 462 n. 23, 601 A.2d at 654 n. 23. " ' "[K]nowledge" exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.' " *Id.* (quoting *State v. McCallum*, 321 Md. 451, 458–61, 583 A.2d 250, 253–55 (1991) (Chasanow, J., concurring)).

■ Additionally, a products liability plaintiff must show that the defendant, having such actual knowledge, exhibited a conscious or deliberate disregard of the potential harm to consumers. *Zenobia*, 325 Md. at 463, 601 A.2d at 654. Under

*Zenobia* it is clear that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard. Instead the test requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer." *Id.*

Further, "the evidence necessary to support a punitive damages award goes far beyond that required to support a compensatory damages award based on the underlying strict liability claim." *Id.* at 465, 601 A.2d at 655. Similarly, "the evidence of actual malice that will support a punitive damages award in a products liability action based on negligence requires the plaintiff to prove much more than negligence." *Id.* As explained in *Komornik,* even in cases of egregious negligence, punitive damages will not lie in the absence of evil motive, intent to injure, ill will or fraud. 331 Md. at 724–31, 629 A.2d at 723–26.

In *Komornik,* as in this case, the claim for punitive damages was based upon non-intentional tortious conduct. *Id.* at 721, 629 A.2d at 721. The plaintiff argued that, because the defendant had repeatedly decided to drive a motor vehicle while intoxicated, his conduct was sufficiently egregious to warrant the imposition of punitive damages. *Id.* at 727, 629 A.2d at 724. Negligence that qualifies for a pejorative adjective does not satisfy the Maryland test for punitive damages.[6]

Historically, the purposes of punitive damages are punishment and deterrence. *Zenobia,* 325 Md. at 454, 601 A.2d at 649–50 (citing *Schaefer v. Miller,* 322 Md. at 321, 587 A.2d at 503; *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966, 973 (1982); *First Nat'l Bank v. Fidelity & Deposit Co.,* 283

---

6. Even in an intentional tort context, actual malice must exist in order for punitive damages to be awarded. *See, e.g., Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 235, 652 A.2d 1117, 1127 (1995). In *Ellerin,* the Court distinguished between an action for fraud or deceit based upon knowing false representation and such an action which is based upon a "reckless disregard" for the truth. *Id.* The *Ellerin* Court ruled that punitive damages would not lie for the latter. *Id.*

Md. 228, 232, 389 A.2d 359, 361 (1978)). We pointed out in *Zenobia* that the inconsistent and unpredictable nature of the preexisting implied malice standard for punitive damages actually undermined the objective of deterrence, because persons had no way of determining which types of behavior would subject them to punitive damages liability. 325 Md. at 455, 601 A.2d at 650. Consequently, those persons could not conform their conduct to avoid such liability. *Id.*[7] In the case *sub judice* deterrence is even less a factor inasmuch as the three defendants involved with the punitive damages issues have not sold asbestos products for more than twenty years.

### Overview

PCC was a manufacturer which did business nationally, ACandS was a distributor-installer which did business nationally, and PH was a distributor-installer which did business in the Middle Atlantic area. PH, and its predecessors, had been in the asbestos business since the 1920s. ACandS was incorporated in 1957 as a contracting subsidiary of Armstrong Cork Company (Cork), and began operating in January 1958. PCC entered asbestos product manufacturing in 1962 through the acquisition of a company that had been in that business. None of these defendants argues that there was insufficient evidence that it should have known of the hazards of asbestos. Each of these defendants, however, asserts that there was insufficient evidence for the jury to find, under the clear and convincing evidence standard, that the respective defendant had made "a bad faith decision ... to market a product, knowing of the defect and danger, in conscious or deliberate

---

7. *See* D. Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257, 1283 n. 135 (1976) ("any definition of the punishable conduct, such as marketing a product in 'reckless,' 'wanton,' or 'flagrant' disregard of the public safety will necessarily be quite vague"); D. Ellis, *Fairness and Efficiency in the Law of Punitive Damages,* 56 S.Cal.L.Rev. 1, 52–53 (1982) ("[T]he law of punitive damages is characterized by a high degree of uncertainty that stems from the use of a multiplicity of vague, overlapping terms.... Accordingly, there is little reason to believe that only deserving defendants are punished, or that fair notice of punishable conduct is provided.").

disregard of the threat to the safety of the consumer." *Zeno-bia*, 325 Md. at 463, 601 A.2d at 654. As we shall explain below, we agree.

For a number of reasons our review of the evidence will concentrate on the period from the late 1950s to the early 1970s. Prior to that period, whenever medical literature that was relatively widely distributed in this country had directed attention to asbestos, the focus, generally speaking, had been on the health risks of persons exposed to raw asbestos in mining and manufacturing, particularly in textile manufacturing.[8] In the late 1950s no producer of asbestos products placed any health warnings on its products. During the mid–1960s some manufacturers began to affix health warnings. The jury found that PH and PCC were not liable for punitive damages for exposures prior to 1965.

Published in December 1965 was an important public health study of the effects of exposure to asbestos on those who installed asbestos products. See I.J. Selikoff, et al., *The Occurrence of Asbestosis Among Insulation Workers in the*

---

**8.** For illustrations see *Pulmonary Asbestosis* (editorial), 90 JAMA 119 (1928); *Regular Correspondent*, 94 JAMA 2078 (1930); *Current Comment—Pulmonary Asbestosis*, 95 JAMA 1431 (1930); K. Lynch & W. Smith, *Pulmonary Asbestosis II, Including the Report of a Pure Case*, 23 Am.Rev. of Tuberculosis 643 (1931); J. Hawes, *Dangerous Dusts*, 216 New Eng.J. of Med. 162 (1937); R.R. Sayers & W.C. Dreessen, *Asbestosis*, 29 Am.J. of Pub. Health 205 (1939); K. Lynch & W. Smith, *Pulmonary Asbestosis III: Carcinoma of Lung in Asbesto–Silicosis*, 24 Am.J. of Cancer 56 (1935); W.C. Hueper, *Industrial Management and Occupational Cancer*, 131 JAMA 738, 739 (1946) ("In recent years . . . cancers of the lung have been noted among workers in chromate plants, nickel refineries and asbestos-manufacturing establishments. . . . The actual causative agent in the production of cancers of the lung in chromate, nickel and asbestos workers is still unknown."); W. Fleischer et al., *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels*, 28 J. of Indus. Hygiene & Toxicology 9, 13–15 (1946) ("Since only three workers out of the 1,074 X-rayed had asbestosis, and each of the three had been a pipe coverer for more than 20 years, it would appear that asbestos pipecovering of naval vessels is a relatively safe occupation."); K. Isselbacher et al., *Asbestosis & Bronchogenic Carcinoma*, 15 Am.J. of Med. 721, 721 (1953) ("Bagging the asbestos, separating the long from the short fibers, carding, spinning and weaving show a greater statistical evidence of asbestosis than do other operations.").

*United States,* 135 Annals N.Y.Acad. of Sci. 139 (1965) (the Selikoff Study). Dr. Selikoff examined 1,117 men who were, or had been, members of the Newark, New Jersey and New York City locals of the International Association of Heat & Frost Insulators & Asbestos Workers (the Union). *Id.* at 141. "[E]vidence of pulmonary asbestosis was present in almost half the men examined." *Id.* at 146. "[R]adiologically evident pulmonary asbestosis varied directly with the duration of exposure. Insulation workers with relatively short periods of exposure have a significantly lower incidence...." *Id.* "Of 379 men whose exposure had begun from 10 to 19 years before examination, more than half still had normal X-rays. Some abnormality was seen on X-ray in 167 of these cases but in only nine was the asbestosis greater than minimal." *Id.* at 147. "On the other hand, among the 392 men with more than 20 years elapsed from onset of exposure, the very large majority had X-ray evidence of pulmonary asbestosis." *Id.* "In 10 men, lung cancer was found, and in one, pleural mesothelioma." *Id.* at 149. Dr. Selikoff concluded "that asbestosis and its complications are significant hazards among insulation workers in the United States at this time." *Id.* at 152.

Dr. Selikoff was also able to obtain for examination, principally from autopsies, lung tissue from forty-five former asbestos insulation workers. He compared these specimens with lung tissue from eleven men working in a factory making asbestos insulation material. *Id.* at 148–49. "Although the data are limited and conclusions perhaps unwarranted, analysis of the findings suggests that the pulmonary fibrosis among [the asbestos factory workers] was significantly greater than among the Building Trades Union Insulation Workers." *Id.* at 149.

The era with which we are concerned ends about 1972 when PCC, ACandS, and PH discontinued manufacturing or using products containing asbestos. These changes, which appear to have been part of an industry-wide movement to use substitutes for asbestos in insulation, roughly coincide with the adoption of safety standards under the federal Occupational

Safety & Health Act of 1970, 29 U.S.C. §§ 651 through 678 (OSHA).

During the era under consideration, a respectable body of opinion considered that asbestos-caused diseases, principally asbestosis, could generally be avoided if dust in the work environment could be kept below a certain limit, the threshold limit value (TLV). One of the groups holding that view was the American Conference of Governmental Industrial Hygienists (ACGIH). It was not a governmental body, but was composed primarily of local, state and federal health officials. ACGIH had begun to issue TLVs in 1946. B. Castleman, *Asbestos: Medical & Legal Aspects,* at 257 (3d ed. 1990) (Castleman). Drawing in part on what some states had been using as a maximum allowable concentration, ACGIH chose a TLV for asbestos of five million particles of dust per cubic foot (MPPCF). *Id.* This is a measurement of dust of all kinds. "Though it may sound like a high concentration, 5 MPPCF of dust in air is not even visibly dusty." Castleman at 250. For comparison purposes, Castleman refers to the reported analysis of air samplings taken in the courtrooms of a courthouse in Rochester, New York in 1935 where the dust levels were measured at 30–43 MPPCF. *Id.* & n. 54. In 1968 and in 1970 ACGIH published notices of an intended change, under which the safety standard for asbestos would measure exposure to asbestos fibers, but ACGIH's TLV was not officially changed until after an OSHA standard was in effect. *Id.* at 271.

The Walsh–Healey Public Contracts Act had adopted a 12–fiber standard in 1969. 34 Fed.Reg. 7946, 7953. The first permanent health standard under OSHA for exposure to asbestos dust became effective July 7, 1972. 37 Fed.Reg. 11318 (1972). This health standard was expressed as an 8–hour, time-weighted average of airborne concentrations of asbestos fibers, longer than five micrometers or microns, determined by a more technically advanced method, the membrane filter method. 29 C.F.R. § 1910.93a(b)(1) and (e) (1973). So measured, the standard was five fibers (5f/cc), with an absolute ceiling at any given time of ten fibers. *Id.* & § 1910.93a(b)(3). Further, this OSHA regulation, for the first

time at the federal level, required a health warning on asbestos products.[9] The original promulgation also provided for the standard to drop to 2f/cc effective July 1, 1976. § 1910.93a(b)(2). The intent was to set a standard that would reasonably assure that no asbestos induced disease would develop in a worker exposed to asbestos every workday, throughout the workday, over a working career of forty years.[10]

Of significance to the punitive damages issue before this Court is the Secretary of Labor's recognition in 1972 that, with proper precautions, asbestos would not be a health hazard. The Secretary's promulgation of the first non-emergency asbestos dust standard in part stated:

"No one has disputed that exposure to asbestos of high enough intensity and long enough duration is causally related to asbestosis and cancers. The dispute is as to the determination of a specific level below which exposure is safe. Various studies attempting to establish quantitative relations between specific levels of exposure to asbestos fibers and the appearance of adverse biological manifestations, such as asbestosis, lung cancers, and mesothelioma, have given rise to controversy as to the validity of the measuring techniques used and the reliability of the relations attempted to be established. Because of the long lapse of time between onset of exposure and biological manifestations, we have now evidence of the consequences

---

**9.** The label was required to state the following:
"CAUTION
Contains Asbestos Fibers
Avoid Creating Dust
Breathing Asbestos Dust May Cause
Serious Bodily Harm"
37 Fed.Reg. at 11321.

**10.** In 1986 the eight hour, time weighted average was changed to 0.2f/cc. 51 Fed.Reg. 22612 (1986). In 1988 a maximum short term exposure limit of 1.0f/cc over a thirty minute sampling period was established. 53 Fed.Reg. 35610 (1988). In 1994 the eight hour standard was set at 0.1f/cc, with the same maximum. 59 Fed.Reg. 40964 (1994).

of exposure, but we do not have, in general, accurate measures of the levels of exposure occurring 20 or 30 years ago, which have given rise to these consequences. There are also controversies concerning the relative toxicity of the various kinds of asbestos, and varying hazards in different workplaces."

37 Fed.Reg. at 11318.

In the instant matter the plaintiffs' approach to proving liability for punitive damages was to rely in large measure upon the proof directed toward liability for compensatory damages. In written and oral argument before this Court the plaintiffs have emphasized, from their state of the art proof on negligence and strict liability, evidence demonstrating direct, and not imputed, knowledge on the part of the defendant corporations that serious health hazards were associated with exposure to asbestos. Much of the evidence deals with the health risks to a respective defendant's own employees.

Against the foregoing background, we review the evidence on which plaintiffs rely.

### A. *Pittsburgh Corning Corporation*

#### 1

PCC manufactured asbestos pipe covering and block under the name, Unibestos. PCC entered the business in 1962 when it acquired the assets of UNARCO, including an existing asbestos production plant in Tyler, Texas. PCC also constructed a factory for asbestos products that occupied approximately ten percent of the area of PCC's facilities at Port Allegany, Pennsylvania. The Port Allegany asbestos plant opened in February 1964 and included a built-in dust collection system.

PCC's supplier of raw asbestos was Cape Asbestos, whose mines were in South Africa. Cape Asbestos also manufactured asbestos products in the United Kingdom. The executive director and chief chemist of Cape Asbestos, Richard Gaze, met with PCC officials prior to PCC's entry into the business. Their discussions included the potential dangers of

asbestos, which Gaze considered to be a useful product when handled with precautions. In his testimony Gaze pointed out that, in the 1960s, the industry was dealing with a situation created by working conditions that had existed fifteen or more years before, and that one did not know whether precautionary steps then being taken would be effective. One of Gaze's recommendations was that PCC hire a medical director. PCC hired as a consultant Dr. L.B. Grant, the medical director of one of the corporate owners of PCC.

In the spring of 1962 PCC gathered a number of articles from medical and scientific literature in order to learn more about the health consequences of asbestos exposure. Most of these articles dealt with the mining of asbestos or its use in the textile industry.

A Norfolk, Virginia insulator had inquired of PCC's technical services department whether there were hazardous chemicals in the dust of Unibestos when subjected to bandsaw cutting. The reply of January 1963 was that, "[w]ith UNIBESTOS there are no hazardous chemicals in the dust from cutting." It was pointed out that the air could become laden with asbestos fibers, causing a feeling of "discomfort" so that PCC's own workmen used respirators. The reply identified the respirator brand and PCC's source. Also in 1963 a PCC production supervisor went through issues of the publication, *Industrial Hygiene Report*, and made longhand notes of the articles on asbestosis, including the connection with cancer.

That same year PCC engaged the Industrial Hygiene Foundation of America to review the potential health hazards of handling asbestos in the manufacture of pipe insulation at the Tyler plant. Air samples taken were analyzed by the Kettering Laboratory. All samplings were well within the TLV, except at the site of a dust collector when it was being cleaned. The report noted that there was "some evidence that the most active particles are those fibers between twenty and fifty microns in length." Included in the report were tables presenting the findings in terms of particle length, but the

report presented no standard against which to measure those findings.

The vice president of manufacturing for PCC, Byrl Stout (Stout), met with Dr. Grant in October 1964. Stout had read an article in the *New York Times* stating that a rare form of cancer, mesothelioma, was caused by exposure to asbestos. The two recognized that employees at the Tyler plant who had worked for the prior owner had a longer exposure and a greater potential for future disability than employees at Port Allegany. Stout "suggested" that Dr. Grant initiate periodic environmental surveys, possibly every two years, and that they begin sometime after January 1, 1965.

A process control engineer from Port Allegany, Ronald Francis (Francis), was sent in October 1965 to study operations at the Cape Asbestos plant in England. There he saw a newspaper article about a form of cancer, mesothelioma, that was described as so rare that its existence had been disputed until recent years. It had been identified in asbestos factory workers, in their spouses, and in those living near the factories. Francis also met with Gaze who said that PCC's dust levels were too high. Francis saw that equipment at the English plant was shrouded. He reported all of this information to PCC's president and others. The president would not authorize an estimated $180,000 for shrouding, because the Port Allegany plant was not profitable. Francis testified that he was considered "an alarmist" because the State of Pennsylvania had inspected the plant and found that the TLVs had been met. He further testified that the workers at all of the plants comprising PCC's Port Allegany facility, including the Unibestos plant, had respirators to wear.

At Stout's request Dr. Grant visited the Texas plant in November 1965. Operations had not changed from those studied in the Industrial Hygiene Foundation survey. In a memorandum to the plant manager following his visit, Dr. Grant noted that "no significant findings relating to asbestos exposure have been encountered" in the annual chest x-rays given to employees. He instructed the plant manager to

continue the x-ray program and to have operations resurveyed "at least every two years to have evidence of the fact that control measures remain adequate."

In December 1965 Dr. Grant learned that a person who had been exposed at the Tyler plant for five years under the prior ownership had obtained a compensation award in 1961.

The State of Pennsylvania again inspected the Port Allegany plant in January 1966 and found that the dust exposures were below the TLV. The director of the Division of Industrial Hygiene concurred in the advisability of PCC's planned installation of pneumatic conveyers at the feeding machines.

The Industrial Hygiene Foundation surveyed selected operations at the entire Port Allegany facility of PCC in April 1966, including the Unibestos plant. Using the five MPPCF TLV and the midget impinger technique, which was "still standard practice in the United States," the survey found that the standard was exceeded only in the area of the raw asbestos feeder. A number of recommendations were made.

Dr. Selikoff's study was discussed at an April 1966 meeting of representatives of companies who sponsored the Industrial Hygiene Foundation, according to a memorandum by Dr. Grant describing the meeting. Relying on Dr. Lewis J. Cralley of the United States Public Health Service (USPHS) as his source, Dr. Grant stated in his memorandum as follows:

"The Division of Occupational Health of [USPHS] . . . feels that Dr. Selikoff's claims are not scientifically based. In fact, the work of Dr. Cralley on the environmental aspects refutes the work done by Dr. Selikoff. However, Dr. Cralley's work has not received the publicity that Dr. Selikoff's work has. The Division of Occupational Health has not tried to interfere with Dr. Selikoff's research grant. They are, however, calling to the attention of the USPHS Contract Monitor the statements that Dr. Selikoff has made in the past which are considered unscientifically based. They will continue to do this in the future."

The memorandum went on to describe how the asbestos industry had not accomplished or published in-house environ-

mental studies and research laboratory investigations. It then stated:

"It was felt the most serious effect of Dr. Selikoff's claims have been on the customer and general public relations. The public will hesitate to use a product that is purported to be associated with serious health implications."

Plaintiffs point to the above-quoted statement as evidence of bad faith on the part of PCC. In the context of the full memorandum, however, it is a statement of a public relations fact of life, namely, the difficulty of conveying to the public the scientific opinion on which PCC, and perhaps others in the industry, were predicating continued production and marketing.

In a letter of April 22, 1966 to the president of PCC, Dr. Grant advised concerning the debate in the scientific community over Dr. Selikoff's findings. The letter also requested PCC's participation in funding further research.

Plaintiffs point to an August 15, 1966 letter by Dr. Grant to the superintendent of the shipyard in Bath, Maine as evidence of PCC's bad faith. In his letter Dr. Grant stated that "pre-employment and annual periodic chest X-ray[s] of all employees in the UNIBESTOS manufacture have failed to reveal any evidence of a dust related pulmonary disease." As proof that this was not Dr. Grant's true state of mind, plaintiffs rely on Dr. Grant's December 1965 memorandum concerning the compensation award made in 1961 to a former UNARCO employee who would never have been examined by PCC. The letter to the Bath shipyards also stated that amosite asbestos "has thus far not been incriminated as a producer of asbestosis." Plaintiffs claim that statement was not true, but they cite no evidence demonstrating that Dr. Grant knew at the time that it was not true. Indeed, the very phraseology of the statement by Dr. Grant shows his recognition that scientific knowledge on the subject field was evolving.

On December 23, 1966 suit was filed in federal court in eastern Texas against a number of asbestos manufacturers, including PCC, by an asbestos worker, Claude J. Tomplait

(Tomplait), who had been employed by a number of insulation contractors.

Plaintiffs also introduced minutes of the August 1967 meeting of the Occupational Health and Safety Committee of the National Insulation Manufacturers Association (NIMA). In attendance were Dr. W.C. Cooper of the University of California, Dr. L.J. Cralley of USPHS, Dr. Grant, and representatives of Certainteed Products Corporation and Owens–Corning Fiberglas Corporation (OCF). The minutes evidence notice of the health hazards of asbestos as well as the efforts then underway to address the problem. Dr. Cooper reported on his studies of insulation contractors on the West Coast which had been in progress for the preceding two years. He intended eventually to study 1,000 to 1,500 insulation workers. He found "evidence of lower lung fibrosis, calcified pleural plaques and/or pleural thickening which he interprets as evidence of asbestosis in about twenty-five percent of those thus far examined." The time weighted exposure to asbestos by these workers was below the TLV. He noted that asbestos dust exposure was significantly less in construction workers generally than in ship builders. Fiber counts were low. A California State Health Department study had found in insulation workers two or three cases of mesothelioma and an increase of bronchiogenic carcinoma of about three times over that expected. It was Dr. Cooper's opinion that these findings raised doubt as to the validity of the TLV.

Dr. Cooper was of the view that control measures could significantly reduce the seriousness of the dust exposure. He recommended wetting down, exhaust ventilation in prefabrication, mixing asbestos cement in a plastic bag, improved housekeeping, and respiratory protection against peak dust concentrations. Dr. Cooper also reported that, to his observation, only twenty percent of the insulators were using respirators.

The minutes also reflect the following:

● The United States Department of Labor had nearly completed a study of workers' compensation problems associated with asbestos;

● USPHS was about to begin a one year study of records of the Bureau of Survivors' Insurance on employees in the mineral fiber industry. If the records study revealed significant trends in health effects, there would be a follow-up medical and environmental study; and

● Kettering Laboratory had completed a duct erosion study for NIMA.

Also in August 1967, Dr. Grant distributed to the NIMA Committee a copy of an article that appeared in the then current issue of the Journal of the American Medical Association. It reported on seventeen cases of mesothelioma in one hospital within a three year period. The only environmental exposure of two of the patients was living in a community adjacent to an asbestos mill.

In June 1968 a house counsel for PCC wrote to the attorney in Texas who was defending the Tomplait suit. The letter reported Dr. Grant's view that the absence of evidence of pulmonary damage among PCC factory workers was of little value in defending the case because the plaintiff, as an applicator, would be exposed to much higher concentrations of dust than factory workers. The letter also sought counsel's views as to the effect on the litigation of a warning legend that PCC wanted to begin placing at once on cartons of Unibestos.

A consultant engaged by PCC resurveyed the airborne dust concentrations at the asbestos plant in Port Allegany and reported in August 1968. The consultant used both the traditional (midget impinger) instrument underlying the five MPPCF TLV and a new assessment technique (membrane filter) that measured asbestos fibers. Under both approaches the concentrations were high, and the consultant recommended a major redesign of the existing ventilation system.

In November 1968 PCC began affixing a warning notice on the shipping cartons of Unibestos block and pipe covering. It read:

## "THIS PRODUCT CONTAINS ASBESTOS FIBER

IF DUST IS CREATED WHEN THIS PRODUCT IS HANDLED, AVOID BREATHING THE DUST.

IF ADEQUATE VENTILATION CONTROL IS NOT POSSIBLE, WEAR RESPIRATOR APPROVED BY U.S. BUREAU OF MINES." [11]

11. There is conflicting evidence on whether PCC actually placed a warning on its products' packaging. PCC's proof includes photographs of the packaging, with close-ups of the warning, and internal memoranda of November 1968 reporting that the warnings are currently being added. The person who was Works Manager at Port Allegany from 1964 to 1969 testified that the warning labels were being affixed for several months before he left that position and that, until printed cartons were available, gummed labels were affixed to the packaging. The former sales manager of the industrial division of PCC testified that in 1968 he cut out the warning printed on a competitor's carton and sent it to another PCC official. Within six months the warning appeared on Unibestos packaging. The former vice-president for sales of PCC testified that warnings were printed on Unibestos cartons beginning in 1968.

Plaintiffs rely on witnesses who testified that they never saw any warnings on Unibestos boxes. These witnesses were: a person who worked in the Unibestos factory at Port Allegany from 1964 to 1978, a person employed in sales for Unibestos in the Midwest from 1965 to 1973, and the Works Manager at Port Allegany from August 1970 to April 1972 who had transferred to PCC's employ in August 1970 from another company. Another witness, who handled purchasing and telephone sales for a Baltimore distributor-installer some twenty-five years prior to testifying, placed the initiation of warnings on Unibestos in 1972. A researcher at the University of California who in 1970 was studying the airborne dust characteristics of certain asbestos products, including Unibestos, "did not recall observing a warnings label" on any boxes furnished from normal stock for use in the study by representatives of the Union.

Plaintiffs also point to a written answer of January 2, 1969 given by Dr. Grant in a deposition on written interrogatories in *Tomplait*. When asked if PCC used warnings, the answer was an unqualified "no." There were, of course, no warnings by PCC relevant to the period of Tomplait's exposure.

On the issue of punitive damages plaintiffs have the burden to prove liability by clear and convincing evidence and not simply by a preponderance. The evidence produced by PCC is both documentary and also based on the recollection of the person responsible for implementing the change to warnings. Plaintiffs' evidence is dependent on human recollection of something that may or may not have been significant to

Also in 1968 NIMA published a fifteen page pamphlet entitled *"Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos."* The recommended practices were "[b]ased on the fact that all materials can be handled safely...." The subjects covered were housekeeping, pipe and block insulation, cements, spraying, stripping, and respiratory equipment. The pamphlet was made available in quantity to member companies, and PCC apportioned its allotment among its distributors.

A January 9, 1969 memorandum, apparently prepared by Dr. Grant for briefing PCC management, makes the following points:

● The current TLV of five MPPCF does not protect and will be lowered.

● USPHS and other studies at Port Allegany and Tyler show exposure to hazardous amounts of asbestos dust.

● Recent studies by the University of California at Berkeley of insulation workers showed quite "significant" asbestosis and an increase in lung cancer, despite the fact that time weighted exposures rarely exceed five MPPCF or the British upper limit of ten fibers per cubic centimeter.

● No study had ever been done specifically on Unibestos installation and tear-out.

● The most effective control would be substitution of a less hazardous material for asbestos.

● If substitution was not possible, in-plant exposure could be adequately controlled by engineering and medical controls, but "[e]nvironmental hazards are much more difficult to control during most installation and tear out."

---

the observer at the time and which may not have been noticed. Under these circumstances plaintiffs have not met the clear and convincing burden. To meet the burden the trier of fact must be persuaded that the truth of the contention is not merely probable, but that it is "highly probable." *McCormick on Evidence* § 340, at 575–76 (4th ed. 1992).

● Insulation contractors had been educated on health problems and controls by NIMA for the preceding two years at regional meetings of the contractors' association.

● The insulation industry has recently begun using warning labels.

In 1970 the United States Navy notified PCC of its intention to cease purchasing Unibestos due to its high asbestos content.[12] PCC presented theoretical reasons why dust from its product should settle faster and therefore present less risk than other products. The Navy selected a group at the University of California at Berkeley, under the supervision of Dr. Cooper, to test the theory at PCC's expense.

The tests simulated working conditions in a ten cubic foot room. The results showed Unibestos produced significantly more airborne asbestos fibers than any of the other three products tested. The University of California team subsequently published its studies in the scientific community.

In 1971 the Texas Health Department requested a federal inspection of the Tyler plant. The report issued in December 1971 found that concentrations at the vast majority of sampling sites greatly exceeded the existing standard for dust particles and the recommended standard for asbestos fibers.

Relatively shortly thereafter PCC discontinued manufacturing insulation products which contained asbestos. The corporate decision was reached sometime prior to September 8–9, 1971. On those dates Dr. Grant made presentations to the workers at Port Allegany, explaining why they would be required to wear respirators until the change-over to an asbestos-free product could be completed in mid–1972.

In further support of punitive damages plaintiffs rely on acts after PCC had affixed warnings. On February 1, 1971

---

12. Unibestos was produced by binding a mat of amosite asbestos fibers with sodium silicate, resulting in an asbestos fiber content of approximately sixty percent. The other major type of asbestos product in the industry was prepared by baking a slurry of calcium silicate and either amosite and/or chrysotile asbestos fibers. The latter type of product contained approximately ten-fifteen percent asbestos.

PCC filed answers to interrogatories in a suit brought in federal court in Texas by another installer, Clarence Borel (Borel). Borel asked whether "most of the products manufactured by [PCC] containing asbestos will in most instances have to be cut, sawed, scribed, shaped or mixed by the ultimate user and his employees." PCC answered "no." Quoting from a Unibestos catalog, plaintiffs argue that PCC "had stated previously" that "Unibestos 'is easy to cut and work.'" The type of possible contradiction relied on is simply not evidence of bad faith in marketing the product.[13]

Plaintiffs also point to another *Borel* interrogatory. PCC was asked whether it "had knowledge of any deaths ... among [PCC] employees ... attributed to the inhalation of asbestos dust or fibers." PCC answered that there were no known cases of death. Plaintiffs contradict the answer with the death certificate of a James W. McMillan who died in Tyler, Texas on November 17, 1970, about three months before the answers were filed. The death certificate states that the immediate cause of death was a malignant mesothelioma due to fine particulate asbestos. Plaintiffs say, without citation to the record, that McMillan was the plant manager. The death certificate describes him as an "engineer" for PCC. Assuming, *arguendo*, that the death certificate was admitted to prove the cause of death, *but see Benjamin v. Woodring*, 268 Md. 593, 303 A.2d 779 (1973), plaintiffs have not undertaken to demonstrate that whoever furnished the "no" answer to local counsel knowingly furnished false information.

Finally, plaintiffs say that PCC advertised in its 1971 catalog that its product would not dust, while knowing of the University of California test results. The catalog to which plaintiffs refer, however, has no date. It is the same catalog,

---

**13.** The set of answers to interrogatories in this record are signed only by local counsel and are not under any affidavit made by a PCC official. Plaintiffs in the instant case have not undertaken to show where local Texas counsel obtained his information. Local counsel, or the person on whom counsel relied, may have interpreted "ultimate user" in the interrogatory to refer to the owner of the structure where the insulation was installed.

discussed above, which plaintiffs also argue was published before PCC's February 1971 answers to interrogatories in *Borel.* Plaintiffs cite no evidentiary support for a 1971 date of catalog publication.

> The statement in the catalog is as follows:
> "These long fibers also give UNIBESTOS its ability to resist rough handling in transit and on the job. It won't break up and dust as other commonly used materials do, even after continued removal and reapplication."

From the context, the quoted claim for the product is apparently based on the length of amosite fibers, the matting process used in production, and the sodium silicate coating. In any event, even if the catalog were published for use during 1971, its presence in the field would have coincided with the period when PCC was deciding whether to discontinue asbestos products entirely and thus would not be clear evidence of bad faith.

### 2

The state of the art proof against PCC cuts both ways. It demonstrates PCC's actual knowledge of health risks, primarily to its employees, throughout the era, but it also demonstrates PCC's efforts to protect its employees throughout the era and to warn users after 1968. At all relevant times the widespread belief was that the extent of the health risk depended, in large part, on the length and intensity of exposure. It may be that a jury would believe that the corporate efforts at protecting its employees were inadequate and motivated only by the desire to minimize PCC's workers' compensation liability, without concern for consumers. It may be that a jury would believe that the corporate decision to adopt health warnings came too late and, even then, that it was motivated only by the desire to minimize tort liability. It may also be that a jury would believe that PCC was not only negligent in these respects, but that it was grossly negligent. These possible inferences or conclusions, however, do not demonstrate that PCC made a bad faith decision to market Unibestos in conscious or deliberate disregard of the threat to

the safety of the consumer. Plaintiffs have not shown by clear and convincing evidence that, by the time the five MPPCF TLV was in question, PCC did not in good faith believe that its recommendations for exhaust ventilation, wetting, shrouding, containerized mixing, housekeeping, and use of respirators were reasonable protections for users.

At oral argument plaintiffs argue that PCC had actual knowledge (1) of the health risks of asbestos from the dust problems PCC had in its own factories, and (2) that the conditions under which installers worked in the field were worse, environmentally, than in PCC's factories. Thus, plaintiffs say that PCC had actual knowledge of the risks to installers. To evidence the second element of this argument plaintiffs rely on the June 1968 letter from PCC's house counsel to its trial counsel in the *Tomplait* case, advising the latter of Dr. Grant's opinion that installation was environmentally worse than manufacturing. It should be noted, however, that Dr. Selikoff's study, published in December 1965, contained his opinion, partly informed and partly intuitive, that factory conditions were worse than those to which members of the Union were exposed. That it may have taken Dr. Grant two and one-half years to depart from Dr. Selikoff's original opinion does not prove bad faith. What is significant under *Zenobia* is that PCC began placing warnings on its products within months after June 1968.

Further, as late as 1971, PCC continued to believe, or hope, that Unibestos was not a health risk because its high concentration of amosite, the long fibered asbestos, would generate less dust and settle more quickly than other products. That notion evidences good faith when one considers that the Navy agreed to defer deleting Unibestos from its procurement list until this theory could be studied. Moreover, the University of California not only undertook to test the theory, but its scholars also considered the results to be a sufficiently significant contribution to knowledge of the subject as of 1971 to warrant publishing the results.

For the foregoing reasons, plaintiffs' evidence against PCC for punitive damages does not reach the *Zenobia* standard of proof.

## B. *Porter Hayden*

The position occupied by PH differs from that of PCC both procedurally in the instant litigation and factually in the asbestos industry. The jury found PH liable for compensatory damages from 1956 to 1979 to both users and bystanders on a negligence theory and from 1956 to the present on a strict liability theory. PH was found liable for punitive damages both to users and bystanders from 1965 to the present. After briefs were filed in this Court, but before oral argument, PH settled with all consolidated plaintiffs other than Leaf, Russell, and McNiel.

The predecessor companies to PH started in the installer-distributor business in the late 1920s. The company maintained offices at one time in Newark, Baltimore, Richmond, and Charlotte and at one time had seventy salaried employees. Essentially PH was an insulation subcontractor which generally furnished both materials and labor. From as early as 1947 through at least 1969 PH was a distributor of JM products. Its workers were members of the Union who were hired through union hiring halls. Unlike a manufacturer such as PCC, PH was not in a position to require pre-employment physicals. To the extent that the asbestos workers regularly might have undergone physical or x-ray examinations, it was through the Union.

PH's position *vis-a-vis* punitive damages is quite simple. It admits that it conducted no field tests, laboratory tests, simulated field condition tests, or other controlled environment tests. It did not conduct any TLV dust counts. It hired no industrial hygienist consultants. PH acknowledged in discovery responses, read into evidence by the plaintiffs, that "[a]s an installer-distributor, [PH] relied upon the superior knowledge, expertise and resources of the manufacturers of the products it installed and distributed to provide safe and suitable products." Although that position is not a defense to

liability for compensatory damages, it is relevant to the punitive damages issue. PH has also admitted in its discovery responses that, during the relevant period, it had not advised persons working with its products to monitor asbestos dust in the work area or to use respirators. The responses put into evidence by the plaintiffs state that PH was not aware that such advice was being given by manufacturers *or by anyone else.*

Plaintiffs' proof of direct knowledge by PH officials of the hazards of asbestos is based largely on workers' compensation claims asserted against that defendant by insulation workers whose symptoms became manifest or whose last injurious exposure to asbestos occurred during employment with PH. The jury's finding that 1956 marks the beginning of liability for compensatory damages is apparently based on the compensation claim asserted in that year by one LeGrand, who had worked for PH for twenty years in Newark. The claim was settled by the insurer, which informed PH this was "not the first asbestosis case." PH's then field superintendent for Newark, Charles Beyer, testified that he was told by a PH sales official, who later became president of PH, to keep quiet about the settlement so that other workers would not be encouraged to file claims ("... I [Beyer] guess they would all be going after it.").[14] There was also proof that in August 1963 the workers' compensation carrier for PH sent to a secretarial employee in the Baltimore office a list of workers' compensation claims asserted against PH over several preceding years. The list included four occupational dust cases, the earliest of which involved a death in March 1959. Included on the list was Charles Beyer who had made a claim in 1960.

---

14. Charles Beyer, who testified via deposition, was also asked whether PH's employees were ever told that asbestos was potentially hazardous. His answer covered only what he personally did or did not do. He said:

"I am sure I wouldn't tell them that it was hazardous. They needed the workers. If they were to go around advertising, you know, it would be no good. They would have no workers."

Losses incurred by the insurer totaled $60,000 on the four lung dust cases.

As the industry changed, PH changed. When the National Insulation Contractors Association published a health precautions brochure in 1971, PH purchased a supply and distributed the brochure to the workers. When OSHA established health standards, PH complied. When the manufacturers stopped using asbestos in products, PH stopped working with asbestos products.

The jury's finding that PH's liability for punitive damages begins in 1965 is apparently based upon Selikoff's study of installers, published in December of that year. Plaintiffs accentuate the Selikoff Study because among its subjects were PH employees. The three illustrative plaintiffs with which we are presently concerned, however, were not installers. Those plaintiffs nevertheless contend that the evidence shows substantial exposure to asbestos dust on the part of trades other than installers. We, however, have not been directed to any proof that contradicts the evidence that installers were not warning bystanders during the relevant period. There is insufficient evidence of actual knowledge on the part of PH that bystanders were considered so clearly at risk that PH's failure to warn bystanders can be found to be a conscious or deliberate disregard of the safety of persons in the position of the three successful illustrative plaintiffs.

Under *Zenobia* there was insufficient evidence to take punitive damages to the jury against PH on behalf of Leaf, Russell, and McNiel.

### C. *ACandS*

ACandS, formerly named Armstrong Contracting & Supply, began insulation contracting as a wholly owned subsidiary of Armstrong Cork Company (Cork) in January 1958.[15] Its

---

15. Sometime after August 1969 Cork changed its name to Armstrong World Industries. We shall use the name "Cork" throughout this opinion.

assets were those of the former contracting division of that manufacturer. Cork spun off ACandS in August 1969. Between 1958 and 1969 Cork, for compensation, performed various services for ACandS, including handling insurance matters.

ACandS had fifty to fifty-four branches throughout the United States, Canada, and Puerto Rico. The average number of installers working for ACandS at any given time was between 2,000 and 2,400. They were members of the Union, hired through the hiring halls. Although ACandS was the nation's largest insulation contractor, its competitors did more business in Maryland than did ACandS. The majority of the products used by ACandS were manufactured for it by manufacturers other than Cork. Cork permitted ACandS to place the Armstrong label and logo on the packaging of asbestos products made for ACandS by others.

Before reviewing the evidence from which plaintiffs argue for punitive damages against ACandS, we address ACandS's argument that part of that evidence, the deposition of James W. Liddell (Liddell), was erroneously admitted into evidence.

1

Liddell had been president of ACandS. His deposition had been taken in early 1981 in an action then pending in the federal court in eastern Missouri, *Bond v. Atlas Asbestos Co., et al.* On the request of all of the parties in *Bond* the court in March 1980 had entered a protective order. ACandS argues to us that use of the Liddell deposition in these consolidated actions violated that protective order.

Whether there is a violation depends on the construction of the order. ACandS construes an introductory provision to apply to all discovery, including deposition testimony, even if the deposition is not marked "confidential." Plaintiffs, on the other hand, construe provisions of the order dealing with its implementation by stamping documents "confidential" as limiting the breadth of the provision on which ACandS principally relies. The Liddell deposition is not marked "confidential,"

and Judge Levin agreed with the plaintiffs' construction. We shall assume, *arguendo,* that Judge Levin erred and that, under a correct construction of the protective order and under principles of comity, the Liddell deposition should not have been admitted.

It is to be noted that ACandS does not contend on this appeal that it would be entitled to judgment based on insufficient evidence of its liability for compensatory damages if the Liddell deposition were out of the case. Rather, ACandS argues that it is entitled to a new trial on all issues because of the alleged error. In order to obtain a new trial based on the erroneous admission of evidence the party seeking the new trial has the burden of showing, not only that the admission of the evidence was erroneous, but also that it was prejudicial. *State of Maryland Deposit Ins. Fund Corp. v. Billman,* 321 Md. 3, 16–17, 580 A.2d 1044, 1050–51 (1990); *Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005, 1011 (1977).

ACandS has not briefed how the assumedly erroneous admission of the Liddell deposition was prejudicial. That defendant advises that the deposition was referred to by plaintiffs' counsel once in opening statement and once in closing argument. Examination of the portions of the record to which we have been referred reveals them to be innocuous.

The objectives on the part of the plaintiffs in *Bond* for taking the Liddell deposition, based upon the excerpts admitted into evidence in the actions before us, seem to have been twofold. The first objective was to show an identity of interest between Cork and ACandS. Cork is no longer a party in the instant actions, and identity of interest is not an issue involving ACandS on this appeal. The second objective was to show knowledge, by individuals who were or later became officers of ACandS, of workers' compensation claims by installers against Cork as well as against ACandS. A written stipulation in the instant case listed twenty-six workers' compensation asbestosis claims made against ACandS over the years, beginning in 1958. Also in evidence are a

number of letters from Cork's insurance department to ACandS listing workers' compensation claims, including those made by employees of the contracting division of Cork. ACandS makes no objection that the admissibility of these letters depends on authentication through the Liddell deposition. The Liddell deposition may evidence that employees of Cork knew of some of these claims against Cork at an earlier time than the incorporation of ACandS, but that is immaterial to the issue of prejudice. This is because the trial court modified the jury's special verdict as to compensatory damages against ACandS to provide that liability would begin only for exposures after ACandS became a separate legal entity.[16]

The assumed error in admitting the Liddell deposition is not prejudicial on the issue of punitive damages because, as we shall see in subparts II.C.2 and C.3, *infra*, Judge Levin correctly granted ACandS's motion for judgment on that issue, even with the Liddell deposition considered as part of the evidence.

### 2

Analysis of ACandS's liability for punitive damages to bystanders is essentially indistinguishable from that of PH. Plaintiffs rely heavily on the defendant's knowledge of workers' compensation claims. Because of the long latency period for asbestosis, insulators who had been exposed during earlier years manifested disability while employed by ACandS and claimed against it.

In August 1959 the insurance department at Cork advised of a claim in Nevada. The writer anticipated an increasing number of claims while expressing doubt that "our type of work could cause asbestosis." ACandS's manager in Milwaukee advised the home office in December 1961 of several pending claims brought by asbestos workers there and requested information about other possible cases in other

---

**16.** ACandS's argument that the modification of the verdict was improper and should result in a new trial is addressed and rejected in Part IV, *infra*.

ACandS offices. The reply of January 1962 listed twenty-nine claims since 1953 against Cork and ACandS. A later inquiry from the Milwaukee office generated an update in March 1963 adding seven cases. Cork's insurance manager called it "a rather imposing list of cases." He stated, "[O]bviously prevention is the key."

Prior to 1964 ACandS insulators had been required to wear respirators only when spraying Limpet, an asbestos product. In 1964 Charles Zeller (Zeller), the manager of construction for ACandS, whose responsibilities included job safety, attended a conference in New York at which Dr. Selikoff spoke.[17] At that conference, also attended by representatives of the Union, Zeller first learned of the health hazards to installers of asbestos in other forms as well. Liddell attended the same or a similar conference. He said that he there learned that asbestos had been scientifically proven as a cause of asbestosis and of cancers. Previously, he had thought that the causal link was a question that was being debated. Either immediately before or after the conference, ACandS installers were instructed generally to use respirators. The installers' response was an "almost total objection" because the respirators were uncomfortable and they could not smoke while wearing them.

One source of product for ACandS was the Eagle–Picher Company (Eagle–Picher). It produced cement for ACandS which the latter sold under the Armstrong label as Armatemp #10 and Armatemp #166. These products contained some asbestos. In June 1964 Eagle–Picher advised ACandS by letter that the former planned to add a note to its products cautioning that asbestos was a product constituent. Enclosed with the letter was a portion of the minutes of a then recent

---

**17.** Zeller's testimony was presented from a transcript of trial testimony given in December 1973 in another proceeding. The witness initially placed the date of the conference as prior to 1962 or 1964. Later in his testimony Zeller did not disagree when the questioner incorporated only the 1964 date in a question.

The former president of ACandS in testimony given in January 1981 also described a similar conference, which he said was held in 1965.

meeting of NIMA reporting that JM was printing a caution on its packaging. The proposed JM notice read as follows:

"'Caution: This product contains asbestos fiber.

"Inhalation of asbestos in excessive quantities over long periods of time may be harmful.

"If dust is created when this product is handled, avoid breathing the dust.

"If adequate ventilation control is not possible wear respirators approved by the U.S. Bureau of Mines for pneumoconiosis producing dust.' "

ACandS was asked whether it wanted Eagle–Picher to place a similar notice on the bags of Armatemp cement. The response to Eagle–Picher's letter is not in the record. It is clear that ACandS did not adopt written warnings at that time.

The Eagle–Picher letter is evidence of actual knowledge of the hazard arising, as per the caution, "[i]f dust is created when this product is handled...." The warning runs to the person opening the package and concerns handling the product. The Eagle–Picher letter does not deal with risks to bystanders. Further, because different inferences, or speculations, could flow from the known facts as to ACandS's good or bad faith toward users, the Eagle–Picher incident does not furnish clear and convincing evidence of a bad faith decision as to users.[18]

Plaintiffs also introduced product data sheets for the entire line of products supplied by ACandS. They argue bad faith marketing by ACandS based on the product data concerning Armatemp #10 cement. A revised data sheet dated July 1964 describes that cement as "a dry mixture of high temperature-resisting spun mineral wool fiber, a hydraulic-setting binder and other ingredients." That same description is carried forward in revisions of September 1968 and March

---

**18.** One inference is that AcandS believed that its employees, as users, had been adequately cautioned to avoid breathing the dust by the recommendation that they wear respirators.

1970. Because, as shown by the Eagle–Picher letter, Armatemp # 10 cement contains some asbestos, plaintiffs say that the failure to disclose that particular constituent evidences bad faith.

In the same exhibit introduced by the plaintiffs, product data sheets for Armatemp # 166 state that that product is "produced from high temperature-resisting spun wool fibers combined with high grade long fiber asbestos and a colloidal clay." A high temperature spray-on insulation, Armaspray, is described in the same exhibit as "a blend of mineral wool fibers, asbestos fibers and inorganic binders." The same exhibit also advises that "[f]or mechanical effects, a small amount of asbestos fiber is included at the time of manufacture" in LK pipe insulation. The reader is further advised that "Armstrong Armabestos Pipe and Block Insulation is composed of fine Amosite asbestos fibers locked into a dispersed mass...." There is no direct evidence why the asbestos constituent in some products is stated while the product data sheet for Armatemp # 10 cement is silent as to asbestos. One inference is that the asbestos content of Armatemp # 10 cement is so low that it was not deemed significant. Another inference is that the purpose of including asbestos in Armatemp # 10 cement was not to furnish insulation, so that its presence would not be of interest to engineers and others who would use the product data sheet when specifying products for particular applications. Whatever the reason might be, the variety of inferences prevents the evidence from rising to the clear and convincing standard required for a finding of bad faith marketing.

In January 1967 Cork's insurance manager, responding to an inquiry from ACandS, advised that from 1952 forward eighty-two asbestosis claims had been made. Forty were open at that time. Of the forty-two that were closed, sixteen involved no payment. Of the twenty-six on which payment had been made, the settlement amounts totaled $60,394.

Three ACandS officials and the Cork insurance manager met in April 1967 to discuss asbestosis claims and the detec-

tion and prevention of asbestosis. They concluded that "[w]hatever action would be taken would require the sanction and support of the [Union]." The memorandum reflects that the Union had been considering the problem for the past two years, without concrete results. The results of the meeting were no more productive.

Plaintiffs view as a "smoking gun" a letter of August 16, 1967 from Cork's insurance manager to two persons in ACandS's management concerning asbestosis claims by workers. The letter is two pages in length, single spaced. The total number of asbestosis claims had increased by four since January. It reviews the dates of previous correspondence about the problem and states: "All of us have given some attention to the problem, but none of us have seemingly been willing to meet it head on." Plaintiffs say that this sentence proves willful indifference. Further on in the letter, the author strongly recommended that ACandS adopt pre-employment x-rays, as its compensation carrier was urging, as well as periodic check ups. The insurance manager also stated that "this action would have to be coupled by a concerted effort at all job locations to keep employees from working in conditions where the atmosphere contains harmful quantities of the disease-producing dust." The author of the letter then frankly acknowledged: "I don't know how the mechanics of such a program could be worked out; but I do feel that if enough heads are put together, we can come up with a reasonable solution that will operate to the economic advantage of [ACandS]." Thus, one fair reading of the letter as a whole is that it evidences the belief that a safe way could be found for handling asbestos in the field.

The New York Academy of Sciences presented a conference on insulation industry hygiene on May 14, 1968 that was attended by representatives from the asbestos industry, including Liddell, by representatives of the Union and of USPHS, and by physicians. As reflected by the agenda, Dr. Selikoff led off discussing, "Health hazards among insulation workmen." Dr. Cooper followed, addressing the topic, "Threshold limit values for asbestos." Dr. Selikoff then spoke

on "Perspectives for elimination of health hazards among insulation workmen." A general discussion among physicians then followed on the "Elements of an Industrial Hygiene Program for the Insulation Industry." Topics to be covered in the discussion included: identification of dust sources, prevention of dust formation, removal of dust, protective masks, housekeeping practices, surveillance procedures, a medical surveillance program, cigarette smoking, and the development of educational material.

The significance of the foregoing to the punitive damages issue before us is that, as late as the spring of 1968, leading medical authorities, the Government, and both management and labor in the industry were focusing on the exposure of asbestos workers and on the development and implementation of strategies so that those who handled asbestos could do so safely.

By 1972 ACandS was not using any asbestos product whatsoever. That transition in its business had been effected over a period of years.

There is a want of clear and convincing evidence that ACandS marketed asbestos products in bad faith, knowing of the danger to bystanders, and in conscious or deliberate disregard of the threat to the safety of bystanders.

### 3

Whether there was sufficient evidence for the jury to find ACandS liable for punitive damages to users raises the practical question of whether there are any user plaintiffs in the consolidated action who claim exposure to ACandS's products. The principal class of users of ACandS's products were workers in ACandS's employ at any given time. ACandS's defense under the Workers' Compensation Act would bar tort claims by those users, even if ACandS were not the employer during the claimant's last injurious exposure. *See Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 50–51, 475 A.2d 1168, 1180 (1984). Any plaintiff in these actions who might have been exposed as a user to ACandS's products seemingly would

have to have been an asbestos worker who was always employed by other insulation contractors or by property owners.

The evidence reflects that the extent is *de minimis* to which ACandS might have sold asbestos products, without installing them through its own employees. ACandS's business was nationwide, and it was a contracting business. Some evidence of sales by ACandS, without installation, was given by the person who served as manager for the Baltimore branch, and later for the Baltimore–Washington region, of ACandS in the period from 1958 to the late 1980s. On the subject of direct sales to property owners, he was asked only about Bethlehem. Bethlehem let annual contracts for materials, but ACandS never got one of those contracts.[19] The witness confirmed that there were sales to other insulation contractors "on an emergency basis." When asked how often that occurred, the witness replied:

> "Oh, my. With a couple of small competitors, very often once a week, I guess. They would come in and pick up some stuff, but by and large to bigger people, quite—."

A question seeking the identity of the "bigger people" cut off the answer, which seemingly was being phrased to make a contrast. Nor have we been referred to any evidence that sales, nationwide, by ACandS of asbestos products, unaccompanied by installation by ACandS, were of any significance.

Inasmuch as the volume of sales to other employers of asbestos workers was, at best, a distant second in importance in ACandS's contracting business, ACandS can hardly be found by clear and convincing evidence to have marketed in conscious or deliberate disregard of the threat to the safety of a class of non-employee users. Any inference that the absence of warning by ACandS of the threat to users employed

---

19. We do not know whether this testimony that Bethlehem purchased asbestos products on annual contracts was considered admissible on issues beyond those involved in the claims against ACandS. If that testimony was generally admissible, it reinforces the conclusion which we reached in Part I.D, *supra,* to the effect that the presence of JM products in Bethlehem storehouses does not prove that those products were sold to Bethlehem by PH.

by others was conscious or deliberate is mitigated by the probability that any other employer purchasing from ACandS was as sophisticated a user as ACandS and would have had a duty to warn its own employees, as ACandS had warned its employees by recommending the use of respirators.

For all of these reasons we conclude that the evidence was insufficient to support punitive damages against ACandS to user plaintiffs, if any.

## III

### *Consolidation*

The defendants assert that the consolidation for trial of the common issues denied them due process. The common issues were those decided in Phases I, III, and IV. Phases III and IV were concerned with liability for punitive damages and the punitive damages multipliers. Special attention has been directed by the defendants to the validity of treating punitive damages as a common issue, but we need not consider those arguments in view of our holding that there was insufficient evidence for punitive damages.[20] Consequently, we address the common issues decided for the consolidated cases in Phase I.

The Phase I special interrogatories that were submitted to the jury are illustrated by those concerning PCC, set forth below (italics indicate jury's findings):

### DEFENDANT: PITTSBURGH CORNING CORPORATION

### NEGLIGENCE

1.

 a) Do you find by a preponderance of the evidence that Defendant Pittsburgh Corning Corporation was negligent in

---

**20.** The absence of any discussion of the use of multipliers does not indicate this Court's approval of their use.

manufacturing, selling, distributing or installing any of its asbestos-containing products? Indicate your answers on the chart [below].

b) If you find Defendant Pittsburgh Corning Corporation was negligent as to one or more products, indicate the dates of the Defendant's negligence for each product with respect to foreseeable USERS and BYSTANDERS.

### DEFINITIONS

A USER is defined as an individual who comes in contact with asbestos fibers by directly handling an asbestos-containing product.

A BYSTANDER is defined as an individual who did not directly handle an asbestos-containing product, but was near enough to an asbestos-containing product's fibers to come in contact with those fibers.

| Pittsburgh Corning Corporation | (a) NEGLIGENT MANUFACTURE, SALE, DISTRIBUTION OR INSTALLATION | | (b) DATES OF NEGLIGENT MANUFACTURE, SALE, DISTRIBUTION OR INSTALLATION, IF ANY | |
|---|---|---|---|---|
| PRODUCTS | YES | NO | USERS | BYSTANDERS |
| ALL OF THE PRODUCTS BELOW | *x* | | *1962–1972* | *1962–1972* |
| –OR– | | | | |
| NONE OF THE PRODUCTS BELOW | | | | |
| –OR– | | | | |
| ONE OR MORE OF THE FOLLOWING PRODUCTS: | | | | |
| Unibestos Pipecovering | | | | |
| Unibestos Block | | | | |

## DEFENDANT: PITTSBURGH CORNING CORPORATION

### STRICT LIABILITY

2.

a) Do you find by a preponderance of the evidence that Defendant Pittsburgh Corning Corporation manufactured, sold, distributed or installed asbestos-containing products that were in a defective condition unreasonably dangerous to foreseeable USERS or BYSTANDERS? Indicate your answers on the chart [below].

b) If you find one or more of Defendant Pittsburgh Corning Corporation's products was defective and unreasonably dangerous, also indicate the dates each product was defective with respect to foreseeable USERS and BYSTANDERS.

| Pittsburgh Corning Corporation | (a) DEFECTIVE AND UNREASONABLY-DANGEROUS | | (b) DATES DEFECTIVE AND UNREASONABLY DANGEROUS, IF ANY | |
|---|---|---|---|---|
| PRODUCTS | YES | NO | USERS | BYSTANDERS |
| ALL OF THE PRODUCTS BELOW | *x* | | *1962–TO PRESENT* | *1962–TO PRESENT* |
| –OR– | | | | |
| NONE OF THE PRODUCTS BELOW | | | | |
| –OR– | | | | |
| ONE OR MORE OF THE FOLLOWING PRODUCTS: | | | | |
| Unibestos Pipecovering | | | | |
| Unibestos Block | | | | |

Maryland Rule 2-503(a) provides that "[w]hen actions involve a common question of law or fact or a common subject matter, the court, ... on its own initiative, may order a joint ... trial or consolidation of any or all of the ... issues...." The defendants contend that the Phase I consolidation lacked the requisite commonality. This contention has no merit. The Phase I issues involve state of the art from the plaintiffs' standpoint. In an asbestos products liability failure to warn action sounding in strict liability or negligence and brought against a manufacturer or a distributor-installer, a plaintiff must show that the defendant knew or should have known that distribution of the product involved an unreasonable risk of causing physical harm to the consumer. *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. at 438–39 n. 8, 601 A.2d at 641–42 n. 8 (in a strict liability failure to warn case "the knowledge or state of the art component is an element to be proven by the plaintiff"); *Eagle–Picher v. Balbos,* 326 Md. at 194–204, 604 A.2d at 452–57. Thus, absent the consolidation, each of the other 8,549 plaintiffs would be required to prove state of the art as to PCC, PH, and ACandS if they were defendants to that plaintiff's claim. The defendants submit that the 8,555 plaintiffs in the consolidation have different occupations, were exposed at different times, at different workplaces, have different diseases, and different medical histories. But none of these factors diminishes the commonality of the Phase I issues, and the Phase I determinations are the only determinations that will be applied against the defendants-appellants at mini-trials of the other plaintiffs' actions.

Issues involving a plaintiff's burden on state of the art in an asbestos products liability failure to warn case are particularly appropriate for consolidation. Absent unusual circumstances, it is senseless to repeat the presentation of the same evidence against the same defendants in successive, individual trials or mini-consolidations. After only a brief introduction to asbestos litigation one recognizes that the same medical studies, medical journal articles, workers' compensation claims, third-party suits, depositions of witnesses, transcripts of court testi-

mony, minutes of meetings, correspondence, and other exhibits are produced against the same defendants in trial after trial throughout the nation. Indeed, the documents have been photocopied so many times for an ever-expanding distribution among members of the plaintiffs and defense bars that the copies introduced into evidence are nearly illegible.

Ten years ago a federal judge in the Southern District of Texas explained why he had combined for a single trial, on the bifurcated issues of liability and punitive damages, the actions of fifty asbestos claimants against ten defendants. *Wilson v. Johns–Manville Sales Corp.,* 107 F.R.D. 250 (S.D.Tex.1985), *aff'd,* 810 F.2d 1358, *reh'g en banc denied,* 815 F.2d 700 (5th Cir.1987). That judge said:

> "It has been the Court's experience that the presentation of the state of the art evidence, offered for the issues of product defectiveness and punitive damages, has become standardized in that it differs little from trial to trial and is not specifically tailored to a particular plaintiff's case. The Court has further learned that the state of the art phase of an asbestos trial constitutes an appreciable portion of the total trial time."

*Id.* at 252.

In the Eastern District of Texas, as of December 31, 1984, the queue of asbestos related personal injury actions awaiting trial totalled nearly 900. *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 470 (5th Cir.1986). Ten plaintiffs moved to certify those cases as a class action. They "hoped to determine in the class action one overarching issue—the viability of the 'state of the art' defense." *Id.* at 470. The District Court agreed and adopted a plan for one trial of issues "including product identification, product defectiveness, gross negligence and punitive damages...." *Id.* at 471 (footnote omitted). On an interlocutory appeal, defendants challenged the constitutionality of the plan. The Fifth Circuit approved the format after cautioning that "fairness as well as necessity dictates that both the parties and the court ensure that *all* of the necessary findings can be and are made in the class action

trial." *Id.* at 475. Significant here is the appellate court's statement that the "plan is clearly superior to the alternative of repeating, hundreds of times over, the litigation of the state of the art issues with, as [the] experienced [District Court] judge says, 'days of the same witnesses, exhibits and issues from trial to trial.'" *Id.* at 473.

Although the format of the subject consolidation involves 8,555 actions, the special verdicts on the Phase I issues produce a result that is not any more adverse to the defendants than if the same special verdicts had been rendered in a trial of the claims of Leaf, Russell, and McNiel only. In that hypothetical the same Phase I verdicts, when embodied in a final judgment, would give rise to issue preclusion or offensive, non-mutual, collateral estoppel. In that hypothetical any of the remaining 8,549 plaintiffs who claimed against one or more of the judgment defendants could use the Phase I jury findings that are part of the judgment to bar the judgment defendant from relitigating the Phase I issues. *Leeds Fed. Sav. & Loan Ass'n v. Metcalf,* 332 Md. 107, 630 A.2d 245 (1993); *Welsh v. Gerber Prods., Inc.,* 315 Md. 510, 555 A.2d 486 (1989); *Washington Suburban Sanitary Comm'n v. TKU Assocs.,* 281 Md. 1, 376 A.2d 505 (1977); *Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968). The determinations adverse to the defendants on the Phase I issues are no more a denial of due process than is the law of issue preclusion.[21]

The defendants' principal argument for the unconstitutionality of the consolidation is that the number of parties, the number of issues, and the volume of the evidence make the proceeding so complex and overwhelming that it is beyond the capacity of the jury to resolve the issues on the law and the

---

**21.** The defendants have also benefitted by the consolidation. The issues of liability for, and amount of, punitive damages were also common issues. In Part II of this opinion we have held that there was insufficient evidence to support punitive damages. Our mandate will bar the remaining 8,549 consolidated plaintiffs at their respective mini-trials from seeking to relitigate the liability of PCC, PH, and ACandS for punitive damages.

evidence, with the result that the defendants are deprived of a fair trial. It should be borne in mind, however, that the subject consolidation was not a consolidation of 8,555 cases for resolution of all of the issues in all of the cases in one trial. Because the same evidence that was introduced here would have been introduced if only the actions of the six illustrative plaintiffs had been tried, the merits of defendants' complexity argument should be tested, not by the number of parties who will be bound by the determination of common issues, but by the cases addressing the consolidation of multiple asbestos actions for full trial on the merits. The jury in the instant matter dealt with six plaintiffs cases against, initially, twelve defendants. By the time the issues were submitted to the jury, there were only six defendants and two cross-claim defendants. As we shall see below, courts have had no difficulty in approving consolidations for full trial on the merits of asbestos actions involving considerably more parties.

By ignoring the fact that the claims of only six plaintiffs were tried in full in the instant matter, the defendants in argument have repeatedly referred to the instant matter as "the mother of all consolidations." So far as our research discloses, that title is held by the Brooklyn Navy Yard cases, *In re Eastern and Southern Districts Asbestos Litigation,* 772 F.Supp. 1380 (E.D. & S.D.N.Y.1991), *aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831 (2d Cir.1992). There the court consolidated sixty-four actions for trial in full on all of the issues. The common denominator was that over ninety percent of the respective plaintiffs' exposures to asbestos occurred in the Brooklyn Navy Yard. *Id.* at 1386. After four months of evidence and argument and after four weeks of deliberation the jury returned plaintiffs' verdicts in fifty-two cases and defense verdicts in twelve cases. The District Courts considered the defendants' challenge to the propriety of the consolidated trials "a contention without substantial merit." 772 F.Supp. at 1384.

The defendants now before us seek to distinguish the Brooklyn Navy Yard cases on the ground that the instant

consolidated actions do not involve a single workplace. In support, defendants cite the New York powerhouses cases. *Malcolm v. National Gypsum Co.,* 995 F.2d 346 (2d Cir.1993). There the trial court had consolidated forty-eight actions for trial on the full merits in a reverse-bifurcation, with damages to be tried first and then liability. Verdicts aggregating over $94 million were returned in favor of forty-five plaintiffs. *Id.* at 348–49. The Second Circuit reversed in a two-one decision. The majority distinguished *Brooklyn Navy Yard* on the ground that there was no primary worksite involved in the powerhouses cases. 995 F.2d at 353. The "only worksite similarity was that each [plaintiff] was alleged to have suffered some part of his asbestos exposure at one or more of over 40 power-generating plants throughout New York State." *Id.* at 351.

The Second Circuit pointed out that for each victim in each of the forty-eight cases "detailed testimony ... was necessary concerning his degree of impairment, specific medical history, emotional state, and medical prognosis." *Id.* at 349. Each victim's medical history had to be studied to determine whether factors other than asbestos were responsible for the physical complaints. *Id.* On the liability aspects of the case, the court summed up by saying that "the maelstrom of facts, figures, and witnesses, with 48 plaintiffs, 25 direct defendants, numerous third-and-fourth party defendants, and evidence regarding culpable non-parties and over 250 worksites throughout the world was likely to lead to jury confusion." *Id.* at 352. Further, the sole appellant in the powerhouses cases was a manufacturer whose liability had been apportioned at nine percent, the same as was attributed to another defendant, OCF. The court considered the evidence as to the latter's liability to be extensive, but viewed the evidence of the appellant's liability to be "vague, minimal, and heavily circumstantial...." *Id.* Under the "unique circumstances" of the case, the Second Circuit concluded that "there is an unacceptably strong chance that the equal apportionment of liability amounted to the jury['s] throwing up its hands in the face of a torrent of evidence." *Id.*

In comparison to the powerhouses cases, the instant jury trial involved six, and not forty-eight, plaintiffs, and the verdict involved six, and not twenty-six, defendants. Nor, as we discuss in Part IV, *infra,* does the instant matter present any material inconsistency in the verdicts.

An excellent review of the opinions addressing consolidation of asbestos cases is found in *In re New York Asbestos Litigation,* 145 F.R.D. 644 (S.D.N.Y.1993). There the court approved the consolidated trial of all issues in twelve actions against eighty-eight defendants and third-party defendants, twenty-three of whom were named in nine or more of the actions. Based on the cases, the court discussed several factors supporting its consolidation order, all of which are present in the instant matter. The first factor, manner of exposure, simply means that "[a]ll plaintiffs were exposed to asbestos in a similar manner—as trades people working with or around products containing asbestos...." *Id.* at 654. Applying another factor, the nature and extent of diseases, the court joined seven mesothelioma cases, one asbestosis case, and one lung cancer case, but excluded one gastric cancer case. *Id.* at 648, 654–55. The "similarity of claims" factor was satisfied in the mix of personal injury and wrongful death claims because they all presented "substantially similar legal issues," *id.* at 655, "particularly state of the art evidence as to what the defendants knew about the dangers of asbestos and when they knew it." *Id.* There, as here, there was commonality of plaintiffs' counsel. *Id.* at 656. There, precautionary measures were available, and, here, precautionary measures were taken.[22] *Id.*

---

**22.** Each member of the jury in the instant matter was furnished with a notebook. It contained a list identifying each attorney and the party represented by that attorney. It contained tabs creating a separate section for each defendant, and the court encouraged the jury to take notes of that which was pertinent to a given defendant. The jurors were furnished with a one page *curriculum vitae* of each expert witness, containing a photograph of that witness. Each side was permitted thirty minutes of interim argument per week, designed to maximize jury comprehension. The court also gave interim instructions, frequently *sua sponte,* including reminders that evidence offered against one

After the decision by the Southern District of New York, reported at 145 F.R.D. 644, the Second Circuit decided *Malcolm* (the powerhouses cases). This lead to a reconsideration by the Southern District of its prior consolidation order. *In re New York Asbestos Litigation*, 149 F.R.D. 490, 493–94 (S.D.N.Y.1993). In *Malcolm*, the Second Circuit's analysis applied factors set forth in 1983 by all of the judges of the United States District Court for the District of Maryland in a memorandum announcing the criteria that they would use to batch asbestos cases for all issues trials. 995 F.2d at 350–51. The Maryland federal judges would consider the degree of commonality as to worksite, occupation, times of exposure, disease type, plaintiffs' counsel, and type of cancer. They would also consider the discovery status in each case and whether the plaintiffs were living or deceased. *In re All Asbestos Cases Pending in the United States District Court for the District of Maryland*, No. BML 1, slip op. at 2–3 (unreported) (D.Md. Dec. 16, 1983). Applying these factors in its reconsideration, the Southern District reaffirmed its consolidation order. 149 F.R.D. at 496–99. At the time of the reconsideration there remained pending six plaintiffs cases against twelve defendants, and two third-party defendants. *Id.* at 494. Of the six plaintiffs cases, four were wrongful death claims and two plaintiffs were living. *Id.* at 498.

Under their criteria Maryland federal judges would consolidate not less than five and not more than eight cases for the trial of all issues. *Maryland Asbestos Cases* at 2.

To the extent that commonality of workplace may be a factor in a six-plaintiff consolidation, the workplace factor does not point in the direction of reversal here. Here Judge Levin permitted each side to select three plaintiffs, respectively, whose cases would be tried in full. In any event, the defendants-appellants cannot complain of a lack of commonality of workplace with respect to the three successful plaintiffs. To the extent that product identification and exposure are chal-

---

defendant was not evidence against other defendants, and that interim argument was argument only and not evidence.

lenged on this appeal, the common denominator of the exposures of McNiel, Russell, and Leaf is the Point. That is a facility on the order of magnitude of the Brooklyn Navy Yard, which the majority in the powerhouses cases considered to be a unitary workplace. *See Malcolm,* 995 F.2d at 354–55 (Walker, J., dissenting).

The concern of a defendant in an asbestos cases consolidation is that its particular defense may be lost in the mass of evidence. One measure of the volume of evidence that will be introduced is the number of parties. From that standpoint, cases not previously cited have approved consolidated trial on all issues of the following numbers of actions: eleven plaintiffs versus one defendant, *In re Minnesota Personal Injury Asbestos Cases v. Keene Corp.,* 481 N.W.2d 24 (Minn.1992); ten plaintiffs, as class representatives, in a trial that would also determine liability and punitive damages for a class of 2,336 members, *Cimino v. Raymark Indus., Inc.,* 739 F.Supp. 328 (E.D.Tex.1990); five plaintiffs cases, of which three were personal injury claims and two were wrongful death claims, *In re Joint Eastern & Southern Districts Asbestos Litigation,* 125 F.R.D. 60 (E.D. & S.D.N.Y.1989); ten plaintiffs representing a class of over 1,000 members, as to whom common issues of liability for compensatory and for punitive damages also would be decided, *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, *reh'g en banc denied,* 785 F.2d 1034 (5th Cir.1986);[23] fifteen plaintiffs cases against six defendants, *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357 (E.D.Pa.1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481 (3d Cir.1985). *See also Wilson v. Johns–Manville Sales Corp.,* 107 F.R.D. 250 (S.D.Tex.1985) (fifty plaintiffs versus eight to twelve defendants each, on common issues of liability and punitive damages).

Also instructive is a case in which the trial court granted a new trial after it had consolidated ten personal injury and

---

**23.** In *Jenkins,* the court also anticipated that the follow-up mini-trials would consolidate the actions of seven to ten plaintiffs. 782 F.2d at 471.

three wrongful death asbestos cases for full trial on all issues. *Cain v. Armstrong World Indus.*, 785 F.Supp. 1448 (S.D.Ala. 1992). The jury had returned one uniform amount of damages for the non-cancer victims and a higher but also uniform amount for the cancer victims. *Id.* at 1450. The form of the verdict segregated the damages awarded for future medical expenses. *Id.* In the cases of seven of the ten living plaintiffs, the amount awarded greatly exceeded the maximum amount that could be awarded under the evidence. *Id.* at 1452.

In the instant matter no defendant argues to us that the amount of compensatory damages is not supported by the evidence, or that compensatory damages are so excessive that the trial court should have granted a new trial. Although they argue that the compensatory damages were unduly high, the defendants have not even briefed the evidence relating to compensatory damages. Rather, the only defect in the many special verdicts rendered by the jury to which the defendants point as evidence of confusion is an error in the date as of which ACandS initially was negligent. In Part IV, *infra*, we uphold Judge Levin's correction of that obvious error in the verdict. Measured against the scope of the task confronting it, that mistake by the jury is *de minimis*.[24]

---

24. "Sometimes even good old Homer nods." ("*[Q]uandoque bonus dormitat Homerus.*"), Horace Book II, Epistle III, 1. 359. Although quick to criticize the jury, the defendants-appellants, before filing their notices of appeal, failed to note that final judgment had not been entered on the docket as required by Maryland Rule 2–601. This Court caused the judgment to be entered on August 22, 1995. Under Maryland Rule 8–602(d) the previously filed notice of appeal is treated as filed on the same day, but after, the entry of the judgment on the docket.

Further, counsel for PCC undertook the preparation of the record extract. Because of omissions from the extract of matters which the plaintiffs claimed to have designated, the plaintiffs moved to correct the record extract. We granted that motion. Relevant here is PCC's reply to that motion, in which PCC in part says, "In a record of this size, there are bound to be some problems and it is unfair to assess such blame to any one party."

The defendants, and particularly the distributors-installers, ACandS and PH, argue that they are prejudiced by the inclusion of bystander plaintiffs in the Phase I issues, because that term is unlimited. They assert that there may be bystander plaintiffs in the consolidation whose exposure at any given time to that defendant's product may be so remote that the defendant had no duty to warn that type of bystander based on what the defendant knew or should have known at the time. Judge Levin's crafting of the common issues of Phase I versus the individual issues of Phase II addresses that concern. The first issue of Phase II is: "Do you find by a preponderance of the evidence that [name of the specific plaintiff] was a foreseeable user and/or bystander?" Phase II also requires a finding that a particular plaintiff was exposed to a product of a particular defendant. The next issue in Phase II asks, "Do you find by a preponderance of the evidence that the Plaintiff, [name of the particular plaintiff], proved that [named plaintiff or victim]'s exposure to that defendant's asbestos-containing products at any time during the dates indicated was a substantial contributing factor in causing his asbestos-related disease and/or death?" These are among the issues that will be submitted in forthcoming mini-trials. They accommodate the defendants' concerns. A defense based on remoteness of a particular bystander plaintiff is not foreclosed by the common issue findings in Phase I of the consolidation.

There is no error, much less an error of constitutional dimension, in the consolidation.

## IV

### *Reformation Of Verdict–ACandS*

ACandS seeks to parlay into a new trial a mistake by the jury in one part of its answer to special interrogatory No. 1 in Phase I of the trial. The jury found that ACandS had negligently manufactured, sold, distributed, or installed its asbestos products as to users and bystanders from 1938 to 1972. ACandS was not incorporated until 1957, and the 1938

date is obviously wrong. In special interrogatory No. 2 of Phase I the jury found that the ACandS asbestos products were defective and unreasonably dangerous as to users and bystanders from 1957 to the present. ACandS does not argue a lack of evidentiary support for the latter.

Prior to submission of the Phase II issues to the jury, ACandS filed a motion to conform the jury's Phase I verdict to the evidence. At a hearing held about the same time, ACandS orally requested the court "in accordance with its revisory power over the verdict, to change that date from 1938 to 1958." Within two weeks thereafter, ACandS filed a written withdrawal of the motion to conform the verdict because the motion was premature. ACandS stated that appropriate motions would be filed upon the entry of judgment.

After all phases of the trial had been completed and all verdicts rendered, ACandS, in its post trial motions, asserted, *inter alia*, that "[t]he negligence finding returned by the jury ... is unsupported by the evidence and must be reversed as ... ACandS, Inc. did not exist as a legal corporate entity until November 1957...." In his omnibus rulings on post trial motions, Judge Levin reformed that portion of the special verdict by deleting "1938" and inserting "1957," as requested. Any objection to correction of the verdict is waived.

Further, Judge Levin acted well within the court's power and discretion. "[I]n a proper case [a verdict] can be molded or reformed to reflect what the jury manifestly and beyond doubt intended." *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 446, 340 A.2d 705, 708 (1975). That action, arising out of a suspected shoplifting scenario, alleged multiple torts. The verdict on the false arrest count was $1,350, and the verdict on the malicious prosecution count was $25,000 in punitive damages, without any finding of compensatory damages. *Id.* at 445, 340 A.2d at 708. The evidence was undisputed that the plaintiff spent $350 for counsel fees in defense of the criminal charge. *Id.* at 446–47, 340 A.2d at 708. Such an outlay is allowable as damages in malicious prosecution, but not in false arrest. *Id.* This Court affirmed the judgment for

punitive damages on the theory that there would be a verdict for compensatory damages on the malicious prosecution count because this Court directed the trial court on remand to modify the verdict by transferring $350 of the jury's award from the false arrest count to the malicious prosecution count. *Id.* at 447–49, 340 A.2d at 709–10.

Jury verdicts were also modified in *Traylor v. Grafton*, 273 Md. 649, 332 A.2d 651 (1975) (verdict for plaintiff, without assessing damages reformed to include liquidated damages less undisputed credit) and in *Davis v. Board of Educ.*, 168 Md. 74, 176 A. 878 (1935) (verdict in condemnation case awarding one cent damages to defendant reformed to enter, in addition, judgment for condemnor for the right, interest, and estates of the condemnee in the property). *Compare Gaither v. Wilmer*, 71 Md. 361, 18 A. 590 (1889) (after jury found for plaintiff without assessing damages, error for court to add amount of damages where defendant had entered a plea of set off to the plaintiff's claims and counsel for the defendant disputed that an agreement on damages had been reached in the course of trial).

ACandS's argument for a new trial is that the mistake shows the jury's confusion of ACandS with Cork which undermines the entire consolidation. We are unable to match the considerable distance covered by ACandS in leaping to that conclusion. We have noted that in the same phase of the trial the jury inserted the 1957 date with respect to strict liability. In addition, with respect to the Leaf claim in Phase II, the jury found that that plaintiff's exposure to ACandS's products commenced in 1958. Because there was no dispute on the evidence, Judge Levin was justified in treating the error as a correctable mistake.

## V

### *Mistrial Motions And Objections*

In this part we address arguments of the defendants-appellants that are based on denials of motions for mistrial or on overrulings of objections. Under a ground rule established

prior to trial an objection made by one defendant operated as an objection by all defendants, unless a defendant that did not wish to join in the objection specifically opted out. There was not, obviously, any similar rule of automatic joinder in a motion for mistrial. We shall apply these standards in determining whether an issue has been preserved for appellate review.

Whether to order a mistrial lies in the sound discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion. *Medical Mut. Liab. Ins. Soc'y v. Evans*, 330 Md. 1, 19, 622 A.2d 103, 112 (1993); *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992). "The question is one of prejudice." *Evans*, 330 Md. at 19, 622 A.2d at 112 (citations omitted). "Where the [motion for a mistrial] is denied and the trial judge gives a curative instruction, we must determine whether the evidence was so prejudicial that it denied the defendant a fair trial; that is, whether the damage in the form of prejudice to the defendant transcended the curative effect of the instruction." *Id.* (quotation marks omitted). *See also Rainville v. State*, 328 Md. 398, 408, 614 A.2d 949, 953–54 (1992); *Kosmas v. State*, 316 Md. 587, 594, 560 A.2d 1137, 1141 (1989).

Defendants-appellants have classified many of their mistrial contentions by subject matter. We shall adopt, and expand on, that format. We shall not include, however, in our review any claimed error concerning opening or rebuttal arguments by the plaintiffs in Phases III and IV because the punitive damages awards are reversed.

### A. *Interim Arguments*

One of the trial techniques adopted by Judge Levin to help the jury was the use of interim statements and arguments. Having "counsel from time to time ... summarize the evidence that has been presented or outline forthcoming evidence" is a technique that has been recognized in Federal Judicial Center, *Manual for Complex Litigation* § 22.34, at 143 (3d ed. 1995). The federal manual states that it is not the

purpose of the technique to argue the case. *Id.* at 144. Rather, the purpose is to facilitate the jury's understanding and remembering of the evidence. *Id.* at 143–44.

In the subject consolidation, the basic trial schedule called for presenting evidence during a "trial week" of Monday through Thursday. During each trial week the plaintiffs' and defendants' sides were respectively permitted thirty minutes of interim argument, and the two cross-claim defendants, whose liability-common issues were also determined in *Abate I*, were allowed, but did not necessarily use, a total of ten minutes of interim argument per trial week. At any time counsel could obtain permission to present interim argument, and a record was kept of the cumulative amount of time used by each side to insure that the maximum was not exceeded. In interim arguments, counsel were permitted to refer to evidence in anticipation that it would be admitted, to explain the significance of evidence admitted or anticipated to be admitted, and to present argument that would otherwise only be permitted in closing arguments.

It is the latter feature of interim argument as applied here that is particularly objectionable to the defendants-appellants. Quite clearly, lead trial counsel for the plaintiffs, from time to time during the course of the trial, utilized a portion of plaintiffs' interim argument to focus and refocus the jury on punitive damages by presenting arguments that were designed to enhance punitive damages. Inasmuch as we have held that the evidence was insufficient to support punitive damages, the prejudice as to punitive damages that the defendants-appellants may have perceived in the interim argument is no longer a factor in our review.

The alleged trial court errors catalogued by the defendants-appellants as abuses of interim argument include instances where no defendant-appellant made the motion for mistrial, or joined in such a motion, or was expressly assumed by Judge Levin to have joined in such a motion. The catalogue includes an instance where only an objection was made, that was sustained. Also included is an instance in which determina-

tion of the propriety of, and any prejudice from, denying a motion for mistrial requires reviewing the context of an interim argument that is not presented in the record extract. We do not consider these instances, for want of preservation.[25]

On the tenth trial day, plaintiffs referred to a suggestion in cross-examination that McNiel may have withheld from his physician the full extent to which McNiel smoked. Counsel argued that the defendants "have no business calling [McNiel] a liar." OCF objected and made a motion for mistrial in which the court considered that all defendants joined. Judge Levin then instructed that the argument was not evidence and that credibility was for the jury.

On the fifteenth and nineteenth trial days, PCC sought a mistrial, or a severance of the cross-claim defendants, Owens–Illinois, Inc. (OI) and W.R. Grace & Co. (Grace), because the thirty minutes of interim argument for the defendants did not allow PCC sufficient time to present its position as a cross-claimant. No prejudice has been demonstrated. OI did not prevail as a cross-claim defendant, and PCC has not briefed the evidence, if any, that would show Grace's liability as a cross-claim defendant to PCC.

On the fifteenth trial day plaintiffs, arguing the absence of warning of product hazard, orated: "Where does it say asbestos causes mesothelioma? Where does it say asbestos kills children? Where does it say asbestos kills wives? Where

---

**25.** At oral argument, the lead-off illustration given by the defendants-appellants of an asserted abuse of interim argument was plaintiffs' comparison of the conduct of the defendant, OCF, to throwing a hand grenade into a crowded building. The point being made was that the manufacturer of a defective product, who knows that the defect can cause death, does not know the identity of any victims and would bear no actual malice, in the ordinary sense, toward the victims. This is the rationale underlying the special rule for punitive damages in products liability cases laid down in *Zenobia*, 325 Md. at 461, 601 A.2d at 653. Plaintiffs' argument was tied to evidence that OCF was seeking to be the number one seller of asbestos products. The motion for mistrial was made only by OCF, no other defendant joined in the motion, and the court did not expressly state that any other defendants would be considered to have joined in the motion.

does it say asbestos kills preachers?"[26] On the forty-ninth trial day plaintiffs were commenting in argument on evidence that the asbestos levels at the Point were considered safe. Plaintiffs caustically commented that Unibestos must have gotten "smart" while being transported from the manufacturing plant in Pennsylvania to the Point. On both occasions PCC's objection was overruled. In *Wilhelm v. State*, 272 Md. 404, 413, 326 A.2d 707, 714 (1974), we said: "There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. . . . He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions." Judge Levin was applying the *Wilhelm* standard.

In a similar vein is a PCC objection overruled on the thirty-second trial day. In concluding an interim argument plaintiffs said: "I ask you, Ladies and Gentlemen, when you consider this product, they call it Unibestos. I call it Uniworstos. Thank you." In the presence of the jury Judge Levin explained that it was argument and not evidence. The argument is based on the evidence, *inter alia*, that in the University of California tests, described in Part II.A, *supra*, Unibestos was the worst of the products tested from the standpoint of asbestos dust created under working conditions.

At least two objections challenge the concept of interim argument as applied in the instant matter. The first arose on the fifteenth trial day. Counsel for PCC, in arguing for a mistrial, submitted that interim argument "unfairly permits plaintiffs' counsel to continually focus on the most inflammatory and unfairly prejudicial evidence against my client and other defendants week in and week out in an unfairly cumulative fashion." Calling interim argument a failed experiment, PCC argued that "[t]he problems it seems to be creating are outweighing any value it may have for the jury."

---

**26.** Plaintiffs' references to the "preacher" are discussed in Part V.E, *infra*.

The background of the second objection may be traced to the seventh trial day. OCF, in interim argument, pointed out that two-thirds of the 8,555 consolidated plaintiffs had worked at the Point, either as Bethlehem employees or in various construction trades. Relying on anticipated evidence, OCF presented an array of toxins, other than asbestos, that are associated with the steelmaking process. Plaintiffs sought an interim instruction on concurrent and substantial causation, clarifying that OCF's interim argument did not present a defense. Judge Levin refused to give his instructions on the law at that time.

Plaintiffs closed their case in chief on the twenty-fifth trial day. Alluding, in the course of an interim argument that day, to the defense's multiple causation theory, plaintiffs said:

"Folks, the Defendants could have chosen to accept their responsibilities, but they continued to shift the blame. They blamed the government, they blamed Bethlehem Steel, they quit blaming the Grand Canyon. I haven't heard about the Grand Canyon for a while and maybe you will hear about it when they come back. They blamed poor Leggette McNiel. They have chosen to stand here and fight and deny the responsibilities, but you good people of the jury have the final choice because you can choose."

OCF moved for a mistrial, PCC joined, and the court assumed that all defendants joined. Judge Levin then took the occasion of denying what plaintiffs call the mistrial "motion *du jour*," to give the following review, out of the presence of the jury.

"I deny the most current motion for mistrial.

"And make the following observations: Number one, as I told the jury promptly upon an objection, it was interim argument, it was not evidence, and I believe counsel, all counsel, Plaintiffs and Defendants should be accorded elbow room to make their points. I, again, want to observe that my experience with interim argument in this case proves the efficacy and soundness of interim argument. Both sides have been able to present their viewpoints with regard to

complex matters. Immediately if anyone stands up and says they want to present interim argument, he or she has the right to do so. The device has been extremely helpful in explaining to the jury why documents were put in evidence, why experts testified the way they did, why fact witnesses, the significance of their testimony and so forth. Indeed I believe that if there were not interim argument, the jury would be sorely troubled because they have to wait until the end of four months to hear closing argument and to hear the instructions of this court.

"Now, while it is true that the Plaintiffs have the burden of proof, the Defendants have indeed denied liability, which is their right. Therefore, the Plaintiffs, I believe, have a right to state the truth, which is that the Defendants have denied liability."

Judge Levin did not abuse his discretion in determining that the benefits of interim argument would, and did, outweigh any problems associated with it. Nor is a mistrial required by any of the rulings reviewed above.

Defendants-appellants also claim that the trial court "stated on the record that after two aborted trials, it did not intend to allow another mistrial." Consolidated General Issues Brief of Appellants, PCC, PH and ACandS at 40. To support that statement defendants-appellants say:

"While addressing concerns regarding the potential effect on jurors of the substantial publicity surrounding the case, the lower court stated:

" 'This trial is ongoing. There has been a lot of time, effort put into preparation for this trial. I do not intend to let this trial be aborted. <u>I do not intend to allow any mistrial to take place.</u>' (emphasis added)."

*Id.*

The quotation above set forth is taken from the record of a meeting with counsel concerning the advertisement that one of the defendants, Keene Corporation, had placed in a newspaper at the situs of an out-of-state trial in which it was involved.

The meeting also concerned the activity of the White Lung Association.

The quotation, as lifted by defendants-appellants, fails to include what immediately follows, namely:

"I don't intend to allow the jury to be affected by undue publicity.

"And having said that, I will say nothing further. I will, in short, take all appropriate steps to assure that there be no improper interference with this trial. Are we ready?"

No further comment by this Court is required.

## B. *Settlements*

The arguments for reversal based on alleged errors involving the settlement with the plaintiffs by various co-defendants may be subclassified into interim instructions and the denial of a mistrial based on improper argument by plaintiffs' counsel.

After the jury had been selected, on the first day of the trial proper, the court advised the jury in preliminary instructions that two of the defendants, Fibreboard Corporation and OI, had settled with the plaintiffs. The jury was told "not to assume that these two settling defendants have admitted responsibility." On the fourteenth trial date the jury was told that Grace and the plaintiffs had "resolved their differences." The jury was told not to draw any inferences from that resolution of differences. After the testimony had concluded, but before the Phase I issues were argued or submitted, the court advised the jury that OCF, Armstrong World Industries, National Gypsum Co., Quigley Co., and U.S. Gypsum Co. had settled. The jury was told not to "make any inferences or draw any conclusions from those settlements...."

There is no error. It was entirely appropriate for the court to advise the jury why parties who were expected to participate, or who had been participating, in the trial were no longer actively opposing the plaintiffs.

At the time of the Grace settlement PCC opposed giving any explanation to the jury because it would provide

"an opportunity for the plaintiffs to paint those defendants who remain in this trial unfairly as the bad guys who have refused to settle...." When plaintiffs' counsel attempted to do what PCC had envisioned, the trial court decisively intervened. Five days after the settlement between Grace and the plaintiffs had been announced, plaintiffs' lead trial counsel, in the course of interim argument, said:

> "Don't fall for the blame-everybody-but-me trick. Then they turn over here to Owens–Illinois and Grace, W.R. Grace, who had the courage to admit their asbestos was hazardous and settle the case...."

The court sustained an objection to the statement and immediately instructed the jury to "ignore the remark about settling and blame." PCC joined in a motion for mistrial that the court overruled, because it considered that its cautionary instruction was sufficient and because it did not "want to lend the weight of this court to either side...."

The foregoing events took place at the end of a trial week. On the following Monday the court met with counsel before the jury assembled. Judge Levin rejected plaintiffs' counsel's justification that the door had been opened by a remark in interim argument by counsel for OCF. Judge Levin told plaintiffs' counsel that he had gone "too far," and that the court could not condone that. As a sanction Judge Levin barred that particular attorney from interim argument for one week. In his opinion on post-trial motions he reflected that the sanction was "particularly damaging" because lead counsel had "shouldered most of the responsibility for the presentation of the plaintiffs' cases."

There was no reversible error in denying the mistrial. Judge Levin's handling of the problem was within his discretion. In any event, from the standpoint of prejudice, plaintiffs convincingly point out that, if the jury viewed the settlements as an admission of liability, then the jury should have found against Grace as a cross-claim defendant, but the jury did not do so.

## C. *Attacks on Defendants and Defense Witnesses*

Under the above heading defendants-appellants set forth a mixed bag of objections and motions. Based on state of the art evidence of instances where spouses who washed the clothes of asbestos workers contracted asbestos induced diseases, counsel for plaintiffs in argument or questioning would refer in various fashions to the exposure of innocent wives and children of asbestos workers, thereby frequently prompting one or more defendants to object. When the court thought that the matter objected to was proper argument, the objection was overruled.

At other times, where the trial court considered a question to embody a matter not in evidence, the questions were rephrased or the court instructed the jury that the argumentative reference was not evidence. Some of the other incidents grouped under the above heading clearly relate exclusively to defendants other than the appellants.

By far the bulk of the incidents of which defendants-appellants complain under this heading arose on the fifty-second day of trial, after PCC had presented its case. Following plaintiffs' interim argument PCC again moved for mistrial, in support of which PCC made a well organized oral argument that recited point by point PCC's objections to the concept of interim argument, to certain rulings on evidence, and to plaintiffs' arguments. Plaintiffs had argued that PCC had lied to the United States Government, to its own employees, and to the jury. PCC's counsel, however, recognized the basis on which plaintiffs justified the argument. PCC's counsel told the court that "there are statements which have been corrected in correspondence by [PCC] to the U.S. Government, but there is no proof of, quote, 'lying' to the U.S. Government on any issues relevant to the cases of these individual plaintiffs."

In the long argument supporting this planned motion for mistrial, PCC at bottom acknowledged that its concern underlying the motion was liability for punitive damages.[27]

---

27. Counsel for PCC summed up the multi-point argument by saying:

Absent the coalescence of both error and prejudice, the points raised under this subject heading are rejected as a basis for reversal.

### D. *Attacks on Credibility of Opposing Counsel*

Under the above heading defendants-appellants present one incident that has not previously been considered. It encompasses less than two pages of transcript, set against the following background.

In final (*i.e.,* non-interim) arguments at the conclusion of Phase II, one of the defense counsel argued the medical evidence, utilizing x-ray and CT films. He argued that the films showed that one of the illustrative plaintiffs, Paul Cannamuccio, had emphysema and not asbestosis. Similarly, he argued that McNiel's extensive smoking history, his chronic cough, and his x-rays were indicative of emphysema.

As he was concluding rebuttal, plaintiffs' counsel complimented defense counsel on his talented explanation of medical terms. At that point plaintiffs' counsel donned a white laboratory coat and stethoscope. Counsel for GAF Corporation objected. Plaintiffs' counsel said: "If I am going to be a doctor, I am going to try to look like one." The court overruled the objection, and we infer that the court wanted to see where plaintiffs' counsel was headed. Plaintiffs' counsel then stated that neither he, nor any of the defense attorneys, was a doctor. He said that he would not attempt to pick up the x-rays and tell the jurors what they showed about Cannamuccio or McNiel. He reminded the jurors that Dr. Rockoff, a radiologist and a "real doctor," interpreted the same pictures to show that McNiel had asbestosis. He reminded the jurors that Dr. Harron, a radiologist and a "real doctor," interpreted films reviewed by him to be consistent with asbes-

---

"All of this argument shows the overbreadth to which [plaintiffs' counsel] has applied different pieces of evidence and is seeking to impugn defendants for conduct, which is not appropriate under Maryland law on the question of punitive damages[,] by attributing other corporate documents to them on punitive issues."

tosis. The films reviewed by Dr. Harron were of Cannamuccio.

At that point, plaintiffs' counsel attempted to present that particular defense attorney with a toy doctor's kit. Counsel for GAF objected, the objection was sustained, and proceedings were recessed for lunch.

The incident described above occurred on July 21. Jury selection had begun on February 18. It was the seventy-eighth day of proceedings, including jury selection. In his opinion on post-trial motions Judge Levin explained that "this light, humorous and altogether brief touch was not amiss in the midst of a huge amount of technical, lengthy, and dry medical testimony. Defendants protest too much."

On the other hand, representatives and owners of corporations that are being sued for billions of dollars likely would see nothing humorous in any aspect of the proceedings. This Court, however, cannot establish any line as a precedent beyond which discretion would be abused in permitting an attempt at humor in the courtroom. Nevertheless, in the instant matter, even if we assume, *arguendo*, that the trial court should have sustained the objection immediately, there is no prejudice requiring a new trial. The object of the theatrical rebuttal was to reinforce the medical evidence supporting the McNiel and Cannamuccio claims, but the jury nonetheless found that Cannamuccio had not "developed an asbestos-related disease."

### E. *References to Matters Not in Evidence*

The two principal contentions presented under this heading involve the "preacher" theme and a skirmish over federal law in the early 1930s.

Plaintiffs' exhibit 248 is an article published in April 1967 in a publication of the American Medical Association—J. Lieben et al., *Mesothelioma and Asbestos Exposure*, 14 Archives of Environmental Health 559 (1967). Dr. Lieben was the chief of the Division of Occupational Health in the Pennsylvania Department of Health. He studied all mesotheliomas diagnosed

between 1958 and 1963 at 162 hospitals serving a population of 6.5 million in Pennsylvania. Forty-two of the reported cases satisfied Dr. Lieben's criteria for accuracy of the diagnosis. One of these forty-two cases was a patient identified as 2–N,

> "a clergyman from 1935 until his death in 1961 [who] never had any occupational asbestos exposure. Prior to becoming a minister he lived for 19 years within one half of a mile of the insulation plant where [three other patients in the study] had worked...."

*Id.* at 561.

Plaintiffs' exhibit 248 was admitted as substantive evidence. It is relevant to the notice and state of the art issues on liability for compensatory and punitive damages. Defendants-appellants have not directed us to any ruling by the trial court restricting the exhibit to a limited purpose.

Defendants-appellants argue that the Lieben article is not proof of the truth of the matters contained therein. The point would be well taken if the issue in this case were whether patient 2–N had in fact lived for nineteen years within one-half mile of an asbestos plant, or whether he had become a minister, or whether he died of mesothelioma. Under the issues in the instant case, however, there is relevance, additional to notice, in that members of the scientific community accepted the reported facts as true. For example, plaintiffs called as a witness Dr. Thomas F. Mancuso, who was age 80 at the time of trial. In 1962 and 1963 Dr. Mancuso had been a consultant on industrial medicine to Philip–Carey Manufacturing Company, a producer of asbestos products. Dr. Mancuso considered the report on Dr. Lieben's study to be "an important article." He said:

> "It was a very important observation that neighbors, individuals living in the radius of an asbestos plant could develop the disease mesothelioma caused by asbestos by just living at a certain distance from it, from the asbestos that was distributed in that area. It was a very important observation."

In the hands of plaintiffs' counsel, the "preacher" became a symbol of the hazard presented by the effect of aerodynamics on unseen asbestos fibers. Their low settling velocity and random disbursement on air currents were described for the jury by an industrial hygienist and epidemiologist from the National Institute of Environmental Health Sciences. The defendants labored under a tactical disadvantage because it is difficult to convey a state of the art defense in a single "buzz" word. It is also tactically difficult from the defense standpoint similarly to encapsulate the Maryland requirement of substantial causation. *Balbos*, 326 Md. at 210, 604 A.2d at 460. Judge Levin did not commit any reversible error in failing to prohibit references to the "preacher."

■■■ The incident concerning federal law arose on plaintiffs' cross-examination of an official of GAF. The court overruled an objection to the following question:

"Did you know that the United States Government, in the 1930s, found the asbestos factories so hazardous that they made it a violation of federal law to allow children to work in the factories?"

PCC moved for a mistrial on the ground that criminal or quasi-criminal conduct had been injected into the case. Further investigation revealed that there was no statute but that a publication of the United States Department of Labor underlay the question. Judge Levin gave a curative instruction, reproduced in the margin, and he told the jury to give whatever weight it wished to the arguments of counsel and to form its own conclusions.[28] We find no reversible error.[29]

---

28. In relevant part, the curative instruction reads:

"Well, there is no child labor law as such, if we define law as a statute. But what [plaintiffs' counsel] was referring to was the report of an advisory committee on employment of minors in hazardous occupations, which was found in a publication called *Monthly Labor Review*, a publication dealing with the United States Department of Labor, Bureau of Statistics, Volume 35, Number 6, December 1932."

29. The defendants-appellants have also briefed, as illustrations of going beyond the evidence, statements made in a rebuttal closing argument by plaintiffs' counsel. Defendants-appellants attribute these statements

## VI

### *Suits By Former PCC Employees*

Admitted into evidence over PCC's objection were copies of the complaints in two civil actions filed by former employees of PCC against it. One involved the Tyler Texas plant and the other that in Port Allegany. The suits were filed two or three years after PCC discontinued manufacturing asbestos products in 1972. To the extent that the evidentiary ruling bears on compensatory damages, PCC argues that the complaints were inadmissible evidence of bad acts under *State v. Cox*, 298 Md. 173, 468 A.2d 319 (1983).

■ The suits were admissible because they are relevant to the issue of notice, inasmuch as the duty to warn may continue after the time of sale. *Zenobia*, 325 Md. at 446–47, 601 A.2d at 645–47; *U.S. Gypsum v. Baltimore*, 336 Md. 145, 160, 647 A.2d 405, 412 (1994).

■ Further, the allegations of the complaints are not prejudicial. They simply confirm what Dr. Grant had told PCC's Texas plant manager in a letter of April 3, 1968 that is in evidence. When strongly recommending reducing asbestos dust exposure of the employees, Dr. Grant said: "You must anticipate that both some cases of asbestosis and an increased incidence of pulmonary carcinoma will develop in your employee population as a result of continued exposure to these levels for fifteen or more years."

There is no reversible error.

## VII

### *Pressure To Settle*

■ The defendants-appellants argue that they were denied due process by "a system designed to force one side [*i.e.*,

---

to Phase II, but they were made in Phase IV, and affect only punitive damages.

the defendants] to surrender...." Consolidated Reply Brief & Brief as Cross–Appellees of PCC, PH and ACandS at 1.

To support this charge, defendants-appellants point to a letter of October 11, 1991 from Judge Levin to Chief Judge Murphy of this Court and to Judge Joseph H.H. Kaplan of the Circuit Court for Baltimore City. Under Article IV, § 18(b) of the Constitution of Maryland, Chief Judge Murphy is "the administrative head of the Judicial system of the State." Judge Kaplan is the administrative judge of the Circuit Court for Baltimore City. Copies of the letter also were sent to judges of the various circuit courts from which cases were transferred for consolidation into *Abate I.* In his letter Judge Levin reviews his then pending plan for the consolidated trial and for a later, master cross-claim trial. He emphasizes the need thereafter for circuit judges to be available for mini-trials in Baltimore City and in the transferor counties.

It is no secret that asbestos litigation is a national crisis. *See* C. Edley & P. Weiler, *Asbestos: A Multi–Billion Dollar Crisis,* 30 Harv.J. on Legis. 383 (1993); Proceedings of the Administrative Conference of the United States, October 31, 1991, Colloquy: An Administrative Alternative to Tort Litigation to Resolve Asbestos Claims, 13 Cardozo L.Rev. 1817 (1992); A. Miller & P. Ainsworth, *Resolving the Asbestos Personal–Injury Litigation Crisis,* 10 Rev.Litig. 419 (1991). It was entirely appropriate for Judge Levin to discuss his plans in this major consolidation with his administrative superiors.

Defendants-appellants rely on the second paragraph in the quotation set forth below from the October 11 letter:

"From four years of my own experience and that of virtually everybody else, if there are firm credible trial dates, these cases will settle. If not, they will not. The West Virginia cases settled when the trial judge emphasized that his state had provided for sufficient trial judges to handle the mini-trials expeditiously. Same with Philadelphia (ten to fifteen judges out of 90 in Philadelphia are

trying asbestos cases and the defendants know it). Same with all other jurisdictions.

"I bring these crucial matters to your attention even though the matter of adequate judicial resources may appear somewhat premature. However, it is not premature when one understands that the defendants will only settle when they have nowhere to go. I want to put maximum pressure on the defendants to settle <u>before the money runs out</u>."

In a bygone era judicial efforts to produce a settlement in a civil case consisted of a brief meeting in chambers between the judge and counsel immediately prior to trial. Today we have scheduling conferences, settlement conferences, pre-trial conferences, and differentiated case management. Nevertheless, throughout these changes, the maxim has remained constant that, ordinarily, DELAY FAVORS THE DEFENDANT. Judge Levin's letter does not imply any more than that.

Of course, the defendants-appellants did not settle. Indeed, their very presence in an appellate court undermines their own argument. Consequently, they submit that they were presented "with a Hobson's choice: either settle or face verdicts inevitably destined to be in favor of the plaintiffs as a result of the design of the trial plan." Consolidated Reply Brief, *supra*, at 1 & 2 (footnote omitted). Our review of the record reveals that the verdicts in favor of the plaintiffs were "as a result of" the law of products liability and the injuries suffered by the prevailing plaintiffs.

## VIII

### Appeal By Owens–Illinois, Inc.

When OI settled with all but 300 to 400 of the consolidated plaintiffs prior to trial, it elected to have certain issues in the cross-claims that were pending against it tried as part of *Abate I.* In Phase I of the proceeding, the jury found that OI had negligently manufactured Kaylo pipecovering and Kaylo block from 1948 to 1958, as to users and bystanders, and that those products were defective and unreasonably dangerous

from 1948 to the present as to users and bystanders. As to the Leaf, Russell, and McNiel cases the jury found in Phase II that the cross-claimants had *failed* to prove that exposure to OI's products was a substantial factor in causing the asbestos-related diseases of those plaintiffs.

Thus, the Phase I verdict determines some aspects of liability adversely to OI as a cross-claim defendant, but no cross-claim has been reduced to a dollar amount of judgment against OI in any of the consolidated cases. The Leaf, Russell, and McNiel claims could be certified as final judgments because the claims of those parties were fully determined. But, in those three cases the judgment as to OI was favorable to OI, and a party cannot appeal from a judgment wholly in its favor. *Paolino v. McCormick & Co.*, 314 Md. 575, 579, 552 A.2d 868, 870 (1989).[30] As to the Phase I finding, "[i]n an action for money damages, an order which decides that there is liability, or which resolves some liability issues in favor of a party seeking damages, but fails to make a determination with regard to the amount of damages, does not dispose of an entire claim and cannot be made final and appealable under Rule 2–602(b)." *Shenasky v. Gunter*, 339 Md. 636, 638, 664 A.2d 882, 883 (1995).

Accordingly, the appeal by OI is dismissed.

## IX

### Costs

The parties are directed to file, within thirty days of the date on which this opinion is filed, memoranda proposing how costs should be allocated. Memoranda on behalf of the plaintiffs and of the defendants-appellants shall not exceed ten pages per side. Memoranda on behalf of OI and PH, respectively, are not to exceed five pages.

---

**30.** For the same reason, the appeals noted in the cases of Paul and Anna Cannamuccio and of William Kalwa by PCC, PH, ACandS, and OI, and the appeals noted by ACandS and PH in the case of Thomas and Mary Godwin are dismissed.

The absence of an allocation of costs will not delay issuance of the mandate.

*ALL APPEALS BY OWENS–ILLINOIS, INC. DISMISSED.*

*APPEALS BY PITTSBURGH CORNING CORPORATION, PORTER HAYDEN COMPANY, AND ACandS, INC. IN THE CANNAMUCCIO, KALWA, AND GODWIN CASES DISMISSED.*

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART.*

*COSTS TO BE ALLOCATED BY A FURTHER ORDER OF THIS COURT.*

## ON MOTION FOR RECONSIDERATION

In their motion for reconsideration plaintiffs have brought to our attention a factual error in the opinion filed October 18, 1995. In Part II.B of the opinion we treated the finding that Porter Hayden Company (PH) was liable for punitive damages to users as having been mooted by a settlement of that issue, effected during the pendency of the appeal. We stated that "PH settled with all consolidated plaintiffs other than Leaf, Russell, and McNiel." 340 Md. 334, 380, 667 A.2d 116, 138 (1995). The settlement does not, in fact, include consolidated plaintiffs who are represented by other counsel than those engaged by Leaf, Russell, and McNiel. Plaintiffs estimate this group to number approximately 600 out of the approximately 8,555 plaintiffs involved in the consolidation. Thus, the finding of PH's liability for punitive damages is not moot as to a non-settling consolidated plaintiff who was exposed on or after 1965 to a PH distributed asbestos product, if:

1. the plaintiff was exposed as a user;

2. the exposure occurred while the user was in the employ of a person other than PH; and

3. the user has never been covered by workers' compensation while in the employ of PH. (*See Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168 (1984)).

In this revised posture of the case we apply the same analysis as that applied in Part II.C.3 of the opinion filed October 18, 1995 where we held that there was insufficient evidence of the liability of ACandS to users for punitive damages. 340 Md. at 391–92, 667 A.2d at 143–44. There was some evidence of isolated sales by ACandS, without installation, in the Baltimore–Washington region. We nevertheless concluded that "the extent is *de minimis* to which ACandS might have sold asbestos products, without installing them through its own employees." 340 Md. at 391, 667 A.2d at 143.

The evidence that PH sold asbestos products for installation by other insulation contractors, or by the employees of property owners, is even weaker than the evidence that ACandS did so. In the face of our holding as to ACandS, plaintiffs in their motion for reconsideration have not referred us to evidence of such sales by PH. Further, the evidence bearing directly on the subject does not support the plaintiffs' position.

PH's business was described by Theodore Mannell (Mannell) who had been employed by PH from 1952 until 1988. From 1952 to 1961 he was a sales engineer in the Newark office, responsible for estimating and selling contracts for insulation. From 1961 to 1966 he was the Newark office assistant manager, and from 1966 to 1974, when he became a vice president of PH in Baltimore, he was manager of the Newark office. He said that PH basically was an insulation contractor that specialized in industrial work, generally power plants, chemical plants, and refineries. Mannell testified that "[c]ompetitors [*i.e.*, other insulation contractors] generally did not wish to buy materials from a contractor competitor, so they find other ways to do it." Consequently, as with ACandS, we hold that PH cannot be found by clear and convincing evidence to have marketed in conscious or deliber-

ate disregard of the threat to the safety of a class of non-employee users.

Except to the extent hereinabove set forth, the motion for reconsideration is denied.